**KAY DUNHILL, Inc., v. DUNHILL FABRICS, Inc.**

District Court, S. D. New York.
March 16, 1942.

**924**

Erwin Feldman, of New York City, for plaintiff.

Sylvester & Harris, of New York City (Charles L. Sylvester and Sidney G. Kingsley, both of New York City, of counsel), for defendant.

CAFFEY, District Judge.

This case comes within the branch of the law dealing with trade-marks and unfair competition. There are some aspects of these subjects as to which there is uncertainty in the decisions. I shall endeavor, however, to dispose of the controversy without resorting to court opinions that are not clear or are not well settled.

Plaintiff manufactures and sells and during their existence its predecessors manufactured and sold dresses. These dresses are, and from the inception of the business have been, of a particular kind. They are moderate priced ready-to-wear made garments for ladies, misses and juniors. They are referred to as tailored classics. Sales are and continuously have been at low prices. They range and have always ranged from $3.95 to $10.95 a piece at retail, with a corresponding lesser range when sold at wholesale.

Plaintiff is a corporation under the laws of New Jersey. It had two predecessors or what have been spoken of as two predecessors. While I shall follow the practice which prevailed at the trial of treating the predecessor with two names as being two predecessors, it would be more precise, however, to say that it has had a single predecessor, a New York corporation, which has borne the two names. The first name of the New York corporation was Dunhill Frocks, Inc. The other name was Kay Dunhill, Inc. (which, it will be noted, is the identical name borne by the plaintiff today). For convenience, unless otherwise stated, the present plaintiff and its two predecessors will hereafter be referred to as the plaintiff.

Dunhill Frocks was organized on and began business about August 14, 1935. Its name was changed to Kay Dunhill, Inc., on February 17, 1936. The New Jersey corporation was organized January 15, 1937. The New York corporation, Kay Dunhill, Inc., transferred all its assets to the New Jersey corporation of that name on January 31, 1937.

As I have indicated, the sole business of plaintiff is and from the beginning has been the manufacture and sale of dresses of the so-called tailored classic type in the moderate price field. For the most part manufacture has been carried on at Long Branch, New Jersey, although recently another plant has been located at Mechanicsville, New York, where plaintiff also produces dresses of the same kind.

Three persons were interested in the formation of the enterprise. They have remained in charge of it ever since and are the officers of the New Jersey company. These are Messrs. Hirsch, Israels and Kalison. They joined in selecting the name Kay Dunhill as the trade name under which plaintiff has always sold its dresses.

In due course the plaintiff applied for registration of Kay Dunhill in distinctive script as a trade-mark for its ladies', misses' and juniors' dresses. Registration was granted December 1, 1936. As you will observe, this was prior to the transfer of its assets by the New York corporation to the New Jersey corporation on January 31, 1937. This transfer expressly included the trade-mark. The next day, however, the New York corporation made a separate transfer of the trade-mark to the New Jersey corporation.

From an early date following the original organization,—and certainly as far back as February 17, 1936, when the name of the plaintiff was changed to Kay Dunhill,—continuously down to date the plaintiff has used Kay Dunhill as its trade-mark on all the dresses it has produced and sold.

The defendant is a corporation under the laws of New York. It was organized in June, 1940. It does not manufacture or sell dresses; at least, it does not directly do so in its own name. On the other hand, its sole business is and always has been the manufacture and sale of fabrics. One of the purposes to which the fabrics are put is sale to manufacturers of dresses for use by them in the manufacture of those dresses.

As is manifest, the word Dunhill appears in the names of both the plaintiff and the defendant. In the name of the defendant that word is followed by the word "Fabrics." The purpose, as I assume,—in part at least,—is to indicate that defendant is engaged in the production and sale of fabrics.

There are other relevant facts, but I shall not set them out at this stage. Many of them will be mentioned hereafter.

The parties are in agreement that this court has jurisdiction of the law suit; also that both have engaged and still are engaged in interstate commerce of their respective products.

As I understand and analyze the arguments of counsel, they present four questions—and substantially four questions only. These are as follows:

(1) Have plaintiff and defendant competed and do they still compete?

(2) If they competed, did the defendant violate plaintiff's trade-mark or was its competition unfair?

(3) Was plaintiff's trade-mark anticipated?

(4) Did the plaintiff come into this court with unclean hands?

I shall take up each of the questions and discuss all of them in turn.

In what I have already said I think perhaps I have included enough facts to enable me to determine the issues raised by the first question. However, it may be better to amplify them somewhat.

The initial outstanding fact is that plaintiff was engaged in manufacturing and selling dresses, whereas the defendant was engaged in manufacturing and selling fabrics. Upon that ground alone, as I understand him, in essence the position of defendant's counsel is that there was not and of necessity, in the sense of the law, there could not be competition between the parties.

Following the organization of plaintiff on August 14, 1935, it proceeded vigorously to develop the project on which those concerned had entered. There is a mass of evidence describing what the parties did. While possibly, as already said, an adequate response to the first question could be made without bringing in additional facts, I feel that it would be more satisfactory, and certainly it can do no harm, to supplement what has previously been recited by outlining the conduct of both plaintiff and defendant. So also, even though the further facts be not actually essential in order to reach a conclusion on the first question, manifestly they will be needed in connection with disposition of one or more of the other questions which must be discussed later.

By way of a preliminary, there should be an explanation of how the business of manufacturing and selling dresses of the class with which the present case is concerned is carried on.

A method prevailing in New York city, and apparently quite general, by which the sale of goods of the character here involved is handled is through a class of persons or corporations referred to as resident buyers. These resident buyers represent a great many stores,—and perhaps most stores,—throughout the United States located outside of this city or its immediate neighborhood who trade in the New York market. They negotiate with manufacturers. The manufacturers in turn negotiate for their materials with a class frequently, and I believe generally, called converters. When the manufacturers have produced their merchandise, the resident agents buy it from them on behalf of their clients scattered throughout the country.

In 1937 plaintiff had about 750 customers. By 1941 sales of its dresses had spread to the 48 States and the District of Columbia. Those sales were made to approximately 1,340 stores. The stores were situated in approximately 1,190 cities in this country. In about 90% of the cities there were franchises or single customers in each city. Arrangements were made with some of the stores also by which they maintained separate distinct departments for handling, and in those departments devoted themselves exclusively to selling, plaintiff's Kay Dunhill dresses. At present there are 23 stores of whose special Kay Dunhill departments there are several typical pictures in evidence. In other instances, while there were not or are not such separate departments in the stores, there were or are indications in each store in some form that there was or is a specified place in the store where Kay Dunhill dresses were or are sold. This result has been or is being accomplished generally by signs. More particularly use was or is made of counter signs or other pointers identifying the locations where those dresses were or are to be found.

There has been and still is a great deal of advertising of plaintiff's dresses. In part this was and is carried on in New York City; in part in various other cities throughout the United States. Some of the advertising has been in what are known as fashion magazines, such as Vogue, Harper's Bazaar, Mademoiselle and Glamour. Likewise there has been advertising in the New York daily papers. There has also

been advertising in this city through market comments made in such papers as Women's Wear Daily and the New York Herald-Tribune.

Outside of the newspapers plaintiff has advertised through broadcasts over the radio. It has also furnished free to its patrons large numbers of descriptive folders and booklets of an advertising nature for distribution by mail to their own customers when bills were sent out, as well as of mats for use by its customers in shaping their own individual advertisements.

In the various communities in which there were stores to which plaintiff sold its products there has been a great deal of local newspaper advertising by the stores, many examples of which have been introduced in evidence. As a rule such advertisements contain statements of the general class of and details about the dresses, as well as the names of the fabrics from which they were made. When the plaintiff was the manufacturer, the name Kay Dunhill as the trade-mark was always included.

As heretofore noted, according to the plaintiff's trade-mark it extended to dresses for ladies, misses and juniors. In the advertisements there were pictures of women, apparently young, each wearing one of plaintiff's dresses. It is a general trade custom in such advertisements to insert the name of the fabrics from which the dresses were made. Indeed, it was said at the trial that this is the only means of complying with a requirement of the Federal Trade Commission designed to prevent misleading as to the composition of merchandise. Moreover, it is the custom of persons interested in fabrics, either as producers of or as manufacturers from them, to obtain registration of the names of the fabrics at the office of a trade association. What they register there are fabric names they select wholly for their own use. Plaintiff followed that practice; so did the defendant.

Plaintiff arranged with converters to supply the entire line of material it selected for use in manufacturing dresses sold under the Kay Dunhill trade-mark. The names it gave to the fabrics it bought were fanciful and generally were associated with a syllable or with some other portion of its own trade name. By means of the registration of the fabric name it maintained complete control of that name in connection with its dresses made therefrom.

By corresponding methods defendant registered names of its own selection for the fabrics it furnished to manufacturers of dresses. These were the fabric names usually employed, and intended universally to be employed, in advertisements of dresses made from the designated fabrics.

According to a computation made up approximately, the total circulation of newspapers which, when they went out, contained advertisements of dresses sold by plaintiff during the years 1938–1941 was about 781,000,000 and the linage of the advertisements was about 2,758,000.

So far as concerns the garments themselves, in addition, in all instances plaintiff identified its dresses in two ways: First, there was sewed inside the neck of each a label bearing plaintiff's trade-mark and trade name. Second, there were attached to the dresses hang tags also bearing plaintiff's trade-mark and trade name. These are illustrated by Exhibits 9, 10 and 11.

From 1935 to January 1, 1942, plaintiff purchased (in round figures) 2,900,000 such hang tags and 2,600,000 such neckline labels.

For advertising plaintiff spent $58,000.

The entire capital with which plaintiff commenced business was $30,000. Yet the statistics establish that it has built up a large and increasing volume of business. For example, for use in manufacturing dresses it has purchased between 8,000,000 and 8,500,000 yards of fabrics. For another example, from a small beginning it has increased to an organization with 3 officers (devoting themselves wholly to the business), 9 employees in the designing department, about 650 in the factories, 5 in the sales office show room and 4 salesmen not stationed at the sales office—a total of about 671.

Using round figures only (Exhibit 32), through the system previously described, plaintiff sold 26,000 dresses in 1935; 249,000 in 1936; 369,000 in 1937; 348,000 in 1938; 406,000 in 1939; 540,000 in 1940; and 488,000 in 1941—making a total of 2,428,000 dresses for the years 1935 to 1941, inclusive.

In dollars the plaintiff's shipments of its dresses sold to customers in round figures were as follows: $894,000 in 1937; $1,092,000 in 1938; $1,252,000 in 1939; $1,300,000 in the fiscal year from August 1, 1938, to July 31, 1939; $1,444,000 from August 1, 1939, to July 31, 1940; and $1,730,000 from August 1, 1940, to July 31, 1941.

There is a great deal more evidence substantiating the picture I have drawn; but, inasmuch as it is for the most part merely confirmatory in so far as it affects making an answer to the first question, I do not think there is occasion to assemble it at this point.

Defendant was incorporated in June, 1940. That was approximately five years after plaintiff began business. When defendant began business, it knew the type and price range of the dresses manufactured by plaintiff, as well as the name and mark under which plaintiff sold them.

As I have said, defendant was a so-called converter. In other words, it converted yarn or other material of similar nature into fabrics and sold those fabrics to manufacturers. Among the manufacturers to which defendant sold its fabrics were some who were engaged in producing dresses. It is established also that there were about 400 dress manufacturers who bought from defendant fabrics it made and that such sales by defendant aggregated approximately 1,113,000 yards. Among those manufacturers, to which defendant sold its fabrics, as defendant knew, were manufacturers who manufactured and sold popular priced ready-to-wear dresses. These dresses, with respect to type and to a considerable extent with respect to prices, as defendant knew, were within the same field and within the same range of prices as the dresses manufactured by plaintiff.

To some extent defendant made allowances for advertisements. These apparently went to the manufacturers themselves or to buyers for them. Defendant did not concern itself with how any advertising allowance was used. Defendant says, however, that it was optional with the manufacturers to which the advertising allowances were made as to how they should be used.

Defendant also provided hang tags. Exhibits 49 and 63 are examples. Apparently these pretty generally,—certainly in most instances,—preceding and at the time of sale of such dresses were affixed to the dresses manufactured from fabrics supplied by defendant. It was the intention of defendant that the hang tags should be attached to all such dresses. Defendant says definitely that it supplied the hang tags free to the dress manufacturers for the purpose of being affixed to the dresses and in sufficient number to be affixed to all dresses manufactured from its fabrics.

So far as disclosed by or I can discover in the evidence, no dresses manufactured from defendant's fabrics were marketed without having defendant's hang tags annexed thereto. On the other hand, when taken in its entirety the evidence convinces me (1) that few, if any, dresses manufactured out of defendant's fabrics were ever sold without having annexed hang tags furnished by defendant; (2) that if any dress produced from defendant's fabrics got on the market without being accompanied by one of defendant's hang tags (annexed thereto), it was accidental; and (3) that absence of a hang tag was contrary to the intention of defendant.

Defendant's hang tags did not in express terms state anything about the dresses themselves except that they revealed the sources of or the trade names of the fabrics. As in the case of plaintiff with respect to fabrics it used, defendant gave to the fabrics it produced and sold names of its own choosing which, as a rule, included a part of its own corporate name. The hang tags bore the further words "A Dunhill Fabric" or, in some other form, an unambiguous indication that the garment to which the tag was attached had been made from the specified fabric which was in the group of fabrics produced by defendant or implied that the fabric employed in manufacturing the dress was a "Dunhill." How this was accomplished can best be seen by examining Exhibits 49 and 63.

So far as shown, the advertising of dresses for sale which had been manufactured from fabrics supplied by defendant was only that inserted by stores which had purchased the dresses from manufacturers. In so far as put into evidence, the advertisements were confined to newspapers in the respective cities in which the stores were located. Fair examples of these are Exhibits 5, 16, 17, 18, 19 and 20. I regard the inference as inescapable that defendant was the origin of the statements contained in the advertisements as to what were the fabrics from which the dresses were made. Moreover, as I see it, the advertisements were capable of being interpreted as meaning to say, and were designed to convey the impression, that the dresses had been manufactured by a concern having the word "Dunhill" in its name, without giving the complete or exact name.

Under the facts as summarized, in the moderate priced ready made tailored classics field of dresses, did the dresses of

plaintiff and the dresses manufactured from fabrics furnished by defendant compete?

On or about July 12, 1940, within about a month after the defendant was organized, plaintiff notified defendant of its claim that defendant was infringing plaintiff's trademark. Plaintiff also demanded that defendant discontinue use of the word "Dunhill" in its corporate name or in connection with its business (Exhibit 52).

Defendant contends that plaintiff is not entitled to recover if the parties were engaged in non-competing lines. Cf. American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317. See, also, Philadelphia Storage Battery Co. v. Mindlin, 163 Misc. 52, 296 N.Y.S. 176, with the cases there cited, and Marvlo Mills, Inc., v. Marvel Mills, Inc., 170 Misc. 770, 11 N.Y.S.2d 37, affirmed 258 App.Div. 715, 15 N.Y.S.2d 137. At this stage, however, I see no occasion to go into the question of what is the law with respect to the point involved. On the other hand, I shall undertake to establish, and I prefer to rely on the showing made by the evidence, that the parties do compete and have competed ever since defendant commenced business.

■ In the branch of the law relating to trade-marks and trade-names it is well settled that a defendant is responsible for the natural and reasonably to be anticipated actions of his customers; for actions which were normal and reasonably rest on or reasonably arise out of the conduct of the defendant. In other words, if a defendant set in motion a chain of events which he could readily foresee would or might reasonably lead to acts by his customers or to acts by those who bought from his customers, he is chargeable with the consequences of such acts; that is, for such acts reasonably following from or predicated on his own conduct.

■ Accordingly, on the facts in the case at bar, I think defendant is liable (1) for the representations by its corporate name; (2) for representations contained on the hang tags attached to the dresses manufactured out of fabrics purchased from defendant; and (3) for representations in advertisements by stores which bought the dresses from the manufacturers. As I understand the law, such liability is of precisely the same kind and goes to the same extent as if such representations had been made by defendant itself directly to the stores or to the customers of the stores. Rice & Hutchins v. Vera Shoe Co., 2d Cir., 290 F. 124, 126; American Viscose Corporation v. Crown Craft, Inc., D.C., 28 F. Supp. 884, 885, decided by Judge Coxe of this court, and cases cited by him. Cf. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 530, 531, 44 S.Ct. 615, 68 L.Ed. 1161.

■ Let the matter be put a bit differently. If defendant individually had done the things, as I have recited them, which were done by the manufacturers and by the stores, and the stores' customers were confused or led to believe, or reasonably might have been deceived into believing, that the dresses they got were produced by plaintiff, then clearly (1) there would have been a contest between stores handling dresses manufactured by plaintiff and stores handling dresses produced from fabrics of defendant and (2) defendant would be answerable for the damages resulting to plaintiff from the contest. So also if such a contest occurred, then plainly there was competition with plaintiff in the sale of dresses which, under the principle of law invoked above, traces directly to defendant and for which defendant should respond.

Defendant argues that there could have been no competition between itself and plaintiff, because they were engaged in different fields; because plaintiff manufactured and sold dresses, but not fabrics, while defendant manufactured and sold fabrics, but not dresses. I feel, however, that the contrary proposition was squarely laid down and, if not, certainly it was necessarily implied in Kushner & Gillman, Inc., v. Mayflower Worsted Co., 56 App. D.C., 165, 11 F.2d 462.

So, as it seems to me here, there would be deception (or at least confusion) of the public through use of its name by defendant as the manufacturer of Dunhill fabrics, as well as from the use of hang tags on or from advertisements of dresses produced from such fabrics, indicating that dresses offered for sale or sold in the markets of New York and elsewhere throughout the country were produced from Dunhill fabrics.

I am unable to construe the decisions otherwise than as ruling that there is competition between plaintiff manufacturer of dresses and defendant producer of fabrics.

 If, as I have concluded is true, defendant competed with plaintiff, the second question (consisting of two branches) is (1) Did defendant violate plaintiff's trade-mark? (2) Was the competition by defendant unfair?

I feel that the principles announced in Armstrong Paint and Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 324, 325, 335, 336, 59 S.Ct. 191, 83 L.Ed. 195, compel an affirmative answer to each sub-question. With regard to "the exclusive right to use the mark" there involved, the Court made a statement, peculiarly applicable to the present case, as follows at page 325 of 305 U.S., at page 196 of 59 S.Ct.:

"If it is a properly registered trade-mark, a ground to support the cause of action is violation of the Trade-Mark Act [15 U.S.C.A. § 81 et seq.]. If it is not a properly registered trade-mark, the ground is unfair competition at common law. The facts supporting a suit for infringement and one for unfair competition are substantially the same. They constitute and make plain the wrong complained of, the violation of the right to exclusive use."

The extract just quoted is practically a reaffirmation of what had previously been laid down in the copyright case of Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L. Ed. 1148. There it was said at pages 246, 247 of 289 U.S., at page 590 of 53 S.Ct.:

" * * * The bill alleges the violation of a single right, namely, the right to protection of the copyrighted play. And it is this violation which constitutes the cause of action. Indeed, the claims of infringement and unfair competition so precisely rest upon identical facts as to be little more than the equivalent of different epithets to characterize the same group of circumstances. The primary relief sought is an injunction to put an end to an essentially single wrong, however differently characterized, not to enjoin distinct wrongs constituting the basis for independent causes of action. * * *

"Thus tested, the claims of infringement and of unfair competition averred in the present bill of complaint are not separate causes of action, but different grounds asserted in support of the same cause of action."

Here the plaintiff alleges (complaint, paragraph 3) a violation of its trade-mark and unfair competition with it by defend-

ant. The same evidence, in essence, supports both causes of action pleaded. The single thing counted on is defendant's breach of plaintiff's exclusive right to its trade-name and to its trade-mark and of plaintiff's corresponding right to be exempt from unfair competition.

Plaintiff suffered injury because in the market purchasers of dresses were either misled into believing that dresses produced from fabrics of defendant had been manufactured by plaintiff or were confused on the subject or that, by means of hang tags or advertising or by other means emanating from and resulting from conduct of defendant, dresses made from fabrics of defendant were sold or palmed off as dresses made by plaintiff.

If the facts recited in the discussion of the first question be correctly stated, then at least prospective buyers of dresses of the class manufactured by plaintiff (1) were or might be confused; or (2), if not affirmatively confused, left uncertain as to whether or not a dress made from a fabric manufactured by defendant (which either (a) merely bore the corporate name of defendant or the words "by Dunhill" without a statement that it was manufactured from fabric which came from defendant or (b) was described in hang tags annexed or in advertisements as "A Dunhill Fabric" or "by Dunhill," unaccompanied by a disclaimer) had been produced by plaintiff; or (3) would or might believe that such dress was manufactured by plaintiff.

Supplementing what has already been said, it should be remembered that in Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 412, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713, it was long ago held that the essence of wrong in trade-mark cases "consists in the sale of the goods of one manufacturer or vendor for those of another." Moreover, it is not necessary to establish by proof particular instances of such sales. The misleading nature of defendant's name or of the contents of hang tags attached to or of advertisements of dresses manufactured from defendant's fabrics and the uncertainty arising therefrom constitute enough to be characterized as a prohibited invasion of the prior and superior exclusive right acquired by plaintiff to the trade name previous to defendant coming into the field as it did. On this subject it was said in Rice & Hutchins v. Vera Shoe Co., 2d Cir., 290 F. 124, at page 126:

"The law does not require that any particular person has been actually misled. * * * If the natural and probable result of the appellee's [defendant's] conduct would be to lead the public to purchase its goods in the belief that they were the appellant's [plaintiff's], such conduct would deceive the ordinary buyer making his purchases under ordinary conditions, and is in law unfair competition."

■ The third question is, Was plaintiff's trade-mark anticipated?

Not all the argument on the subject has used the word "anticipated." Yet, in substance, the contention is that plaintiff's trade-mark has been anticipated.

Anticipation has not been set up in the answer. Nevertheless, it has been discussed orally and I shall deal with it as if it were well pleaded. However, I shall not now consider, because (as I conceive) at the moment there is no need for considering, whether anticipation of plaintiff's trade-mark would be a sufficient defense if formally pleaded and if I should answer yes to the question I have just propounded.

No treatment of the subject would be complete which omitted the facts with respect to a corporation called Alfred Dunhill of London, Inc.; but temporarily that will be laid aside. Hereafter it will be taken up fully.

There are several corporations which were connected or associated with, and for the most part connected with, Alfred Dunhill of London, Inc. I shall not go into all of these. I shall, however, discuss the one which comes nearer affording support to defendant's contention than any other of the so-called Alfred Dunhill group and which, if defendant be right, is an apt citation in support of its position with respect to anticipation. The exceptional corporation referred to is Mary Dunhill, Inc. This was organized in 1934 and is engaged in New York City in the sale of cosmetics and perfumes.

Outside of the Alfred Dunhill group eight registered trade-marks having Dunhill in their names have been put in evidence by defendant. The registrations of all except one were earlier in date than the registration of plaintiff's trade-mark (Exhibit C).

The eight outside trade-marks ("outside" meaning not connected or associated with Alfred Dunhill of London, Inc.) are owned by six concerns. The trade-marks are as follows:

(1). Trade-mark No. 190,787 registered in 1924 by Dunhill Tailored Clothes, Inc., for "men's suits and overcoats."

(2). Trade-mark No. 267,306 registered in 1928 by a corporation, the abbreviated name of which is Hillborn & Reed, for hosiery.

(3). Trade-mark No. 242,250 registered in 1928 by Fordon Bros. to cover "men's and boys' dress and work shirts, blouses, and pajamas."

(4) and (5). Trade-mark Nos. 257,471 and 290,987 registered in 1929 and 1932 by Crescent Hat and Cap Company to cover "men's and boys' hats and caps, including felt hats and straw hats."

(6) and (7). Trade-mark Nos. 307,037 and 324,386 registered in 1933 and 1935 (May 14) by Scharf Bros. to cover "confectionery—namely, candy."

(8). Trade-mark No. 383,933 registered in 1940 (more than four years subsequent to the registration of plaintiff's trade-mark), by Starr Pen Co. to cover "fountain pens."

As will be observed, plaintiff's trade-mark consists of the words "Kay Dunhill" in script. It covers, and under it plaintiff has engaged only in producing, dresses for ladies, misses and juniors.

The Mary Dunhill trade-mark consists merely of the word "Dunhill." The eight other trade-marks, belonging to six outsiders, consist either of the word "Dunhill" or the word "Dunhills" in print. The nine trade-marks mentioned are for (1) cosmetics and perfumes, (2) men's suits and overcoats, (3) hosiery, (4) men's and boys' shirts, blouses and pajamas, (5) men's and boys' hats and caps, (6) candy and (7) fountain pens.

From a mere recital of the fields in which Mary Dunhill and the six outsiders were engaged I think it manifest that there was no competition between them or any of them and plaintiff; nor is there room for any finding from the names themselves, or from any evidence introduced in this case, that there exists or it is possible for there ever to exist confusion between products described in their trade-marks manufactured or sold in the market by Mary Dunhill or by any of the six outsiders and prod-

ucts of plaintiff. As I understand the decision, on facts indistinguishable in substance from those in the case at bar, this was definitely determined long ago in American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317, and is still universally accepted as the law.

In that case both contenders used the word "Simplex" as a trade-mark. One was engaged in the manufacture of and using its trade-mark on railway car accessories and the other on conducting wire. Those articles were no more remote from each other than are the articles I have recited covered by the trade-marks of Mary Dunhill and six outsiders from the trade-mark of plaintiff. The reason for the conclusion that there was no interference with each other in circumstances like those and no ground for deception was included in a statement in the Robertson case as follows at pages 380, 384 of 269 U.S., at page 162 of 46 S.Ct.:

"The mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of the same trade-mark by others on articles of a different description. * * * it does not appear that the use of the word [Simplex] as a trade-mark upon the goods of the plaintiff will probably confuse or deceive the public to the injury of the defendant [the defendant being the owner of a trade-mark objecting to another having a trade-mark of the same general name] or of any other corporation."

There are further grounds on which it could be maintained that anticipation of plaintiff's trade-mark has not been proved. The single ground already assigned being conclusive, however, there is no good reason for pursuing the matter further.

This brings us to the fourth question: Did plaintiff come into this court with clean hands?

There has been more discussion by defendant's counsel of the question just stated than of any other question in this case. As I gather, he insists more earnestly on the defense of unclean hands than on any other point he has urged.

All the unclean hands argument, as it seems to me, turns on consideration of facts connected with Alfred Dunhill of London, Inc. (hereinafter generally referred to as Alfred Dunhill of London). As I have previously indicated I would do,

I shall, therefore, now state such of the facts as seem to me relevant in regard to that corporation.

Alfred Dunhill of London is a corporation under the laws of Delaware. It was incorporated in 1921. It has been engaged in business in this city ever since. It has chiefly been a seller of smokers' articles or accessories connected with them. It has sold both at wholesale and at retail; but we are not concerned with the wholesale branch of its business, which has been carried on and is now carried on at an address in East 26th Street, New York city.

From 1922 to 1933 the corporation had a retail store at the corner of 43rd Street and Fifth Avenue. In that store it never kept or sold dresses. In fact it has never handled dresses anywhere except in Rockefeller Center.

In 1933 it opened a retail store in Rockefeller Center, at the corner of 50th Street and Fifth Avenue. In November, 1933, in its Rockefeller Center store it added, as a new business, a department in which it sold ladies' dresses. It continued to sell those dresses there for about twenty months. It ended sales of dresses in July, 1935. As matter of fact it determined in March or April, 1935, to discontinue the dress business. The reason its president assigns is that it did not like the business of selling the dresses. By July 4, 1935, it had disposed of all except odds and ends of its stock of dresses. It did not complete selling out the remnants of what it had on hand, however, until later in July.

Since discontinuance of the business of selling ladies' dresses in July, 1935, Alfred Dunhill of London has not engaged at all in that branch of business. It does not contemplate renewal of the business, although, as its president stated, it regards itself as entitled to retain the right, as it thinks it now has, to sell ladies' dresses if and whenever it gets ready.

Prior to August, 1935, so far as is known, no one ever sold women's clothing under the name Dunhill. During the period from November, 1933, to July, 1935, when the Alfred Dunhill of London store was selling dresses, it sold also coats, suits, blouses, sweaters, sports wear, knit wear, belts, gloves, scarfs, ties, bathing suits, millinery and fur coats. In addition it sold ladies' hand bags, cosmetics, jewelry and stationery, as well as pouches, bill folds and wal-

lets (made of leather) and sundry goods (made of metal) which were related to pipes.

Some of the articles just enumerated (outside of women's clothing) were sold preceding November, 1933, and some are still sold. Nevertheless, directly or through subsidiaries, the chief business of Alfred Dunhill of London, Inc., is and always has been smokers' articles (such as pipes and tobacco). Its reputation is mostly in connection with those articles. The concern has never handled low priced garments. None of the dresses ever sold by it were of the class or type or within the price range of dresses sold by plaintiff. All or practically all the garments it ever handled have been high priced. Wholly, or without material exceptions, these were bought from others—though some were manufactured specially for it. So far as appears, individually it has never engaged in the production of garments. It has done no advertising of garments outside of New York city. In its business it has used the trade-marks "Dunhill" and "Alfred Dunhill."

During the 20 months it was in the dress business its total sales of dresses aggregated approximately $77,000.

On or about October 9, 1935, Alfred Dunhill of London served notice on plaintiff of a claim that, through using the word "Dunhill" as part of its corporate name and in connection with its business, plaintiff was violating the rights of Alfred Dunhill of London and demanded that it cease and desist from using the name Dunhill.

As will be observed, the notice was given about two months subsequent to the organization in August, 1935, of plaintiff's first predecessor. The date of the notice was approximately four months after Alfred Dunhill of London had decided to quit the dress business and somewhat more than two months after it had entirely ceased to sell dresses.

To what extent (if at all) plaintiff had gone in its manufacture or sale of dresses, if it had already manufactured or sold them, when the so-called infringement notice was served is not made clear in the evidence; but I deem it unimportant.

Defendant very seriously insists that, in the light of the facts recited, plaintiff going into or continuing the manufacture and sale of dresses, and particularly persisting in such manufacture and sale after it got the infringement notice, renders plaintiff guilty of unclean hands.

The law on the subject of what constitutes unclean hands and of their being an obstacle to recovery in an equity suit seems to me clear. So also, as I read the cases which are cited by defendant, there is no difference between the Supreme Court of the United States and the courts in the State of New York as to what the law is.

Defendant relies on three cases. These are Ubeda v. Zialcita, 226 U.S. 452, 33 S. Ct. 165, 57 L.Ed. 296; Prince Manufacturing Co. v. Prince's Metallic Paint Co., 135 N.Y. 24, 31 N.E. 990, 17 L.R.A. 129; and Penet, Inc., v. F. Pinet Shoe Co., Inc., 236 App.Div. 479, 260 N.Y.S. 63.

■ As I interpret those decisions, they hold that, in order to sustain the defense of unclean hands in a trade-mark or unfair competition case, the evidence must establish that the plaintiff has committed a fraud in respect to the matter in controversy in the suit. They furnish no support for the proposition that it is enough merely to show violation of the defendant's right in a trade-name or in a trade-mark.

In the Ubeda case the article dealt with was gin; in the Prince case, paint; and in the Penet case, shoes.

The Ubeda case arose in the Philippine Islands. The action was between two residents there. The plaintiff was a manufacturer of gin and sought to restrain use of a trade-mark like his own by the defendant.

Preceding plaintiff's entry into the production and sale of gin in the Philippine Islands there had long existed a manufacturer and seller of gin in Holland, whose name was Van Den Bergh & Company. The Holland firm had "a much earlier and widely known trademark" for its gin and that gin had a very excellent reputation. 226 U.S. pages 453, 454, 33 S. Ct. 166, 57 L.Ed. 296.

From the opinion of the Supreme Court it appears that at one time the Philippine gin merchant used an expression on his trade-mark which indicated that the article he was handling was gin imported from Holland. This was accomplished by insertion in his trade-mark of the word "Antwerp." 226 U.S. page 453, 33 S.Ct. 165, 57 L.Ed. 296. That, however, does not seem to have been one of the grounds on which

Mr. Justice Holmes predicated the view he expressed in the case when it reached the Supreme Court.

The local trial court in the Philippine Islands, as well as Mr. Justice Holmes, reached the conclusion on the evidence that the Philippine gin producer had framed his own trade-mark so as to give the impression to one who read and relied on it- that his gin was Holland gin. I see no escape from interpreting to this effect the language of Mr. Justice Holmes.

Thus the opinion says (1) that the plaintiff's trade-mark "closely imitates in most particulars" the Van Den Bergh trade-mark; (2) that "the intent [of the plaintiff] to get the benefit of the Van Den Bergh device is too obvious to be doubted;" (3) that "the obvious intent and necessary effect of imitating it [the Van Den Bergh trade-mark] was to steal some of the good will attaching to it and to defraud the public"; and (4) that "The courts below found the fraud and that both plaintiff's and defendant's marks were nothing more than variations upon the earlier [Van Den Bergh] mark." 226 U.S. pages 453, 454, 33 S.Ct. 166, 57 L.Ed. 296.

It is the "imposition on the public," described in the extracts quoted, that Mr. Justice Holmes denounced as constituting the fraud and unclean hands which debarred the plaintiff from maintaining his suit.

In the Prince case the ruling was along the same lines. It will be enough to state the substance of the facts that are relevant.

The founder of a business sold paint under the trade-mark "Prince's Metallic Paint." For a long time the article had been produced exclusively from an ore that was derived from a particular parcel of land, which was described as the Prince mine. Representation to this effect had been widely disseminated and known in, as well as relied on by, the trade. For many years the operator of the plant had told customers that the superiority of the paint was attributable to the extraordinarily good quality of the ore which came from the Prince mine; that this mine produced an ore from which was made a paint better than could be made from ore taken from any other parcel of land. These statements also went to the trade.

In the course of time the business passed to a new hand. The successor continued the representation that his paint was made from the Prince mine and continued to sell the paint under the same name. As matter of fact, however, half the ore used came from entirely new land, wholly disassociated from the land from which originally came the ore out of which paint had been produced under the old management and this fact was not disclosed to the trade.

The court held that the false representations described were a fraud. On this ground it was also held that the plaintiff was guilty of unclean hands. The court said at page 38 of 135 N.Y., at page 993 of 31 N.E., 17 L.R.A. 129: "* * * Any material misrepresentation in a label or trade-mark as to the person by whom the article is manufactured, or as to the place where manufactured, or as to the materials composing it, or any other material false representation, deprives a party of the right to relief in equity."

For many years there existed a concern called Pinet in Paris. It made shoes of excellent reputation which sold at very high prices. The plaintiff established a business on Madison Avenue, New York city. Its name, as you will observe, was Penet; not Pinet. Apparently the names were pronounced alike. By exhibitions in its show window and by labeling attached to the lining of the shoes it sold, the plaintiff Penet represented that its shoes were made by or came from Penet of Paris, which was designed to be understood to refer to the Paris concern of Pinet. That was wholly false. As matter of fact, pretty nearly all the shoes sold by plaintiff Penet were American made.

The Pinet concern of Paris established a store on Fifth Avenue in this city. Thereupon the Madison Avenue store sought to enjoin the Fifth Avenue store.

The court found that the Madison Avenue store was seeking to sell its shoes by means of the fraudulent representation that they came largely from Pinet of Paris and, therefore, denied relief.

The principle laid down in the three cases, as I read them, is that if a plaintiff has committed a fraud with respect to the very matter on which he sues, he is guilty of unclean hands and, hence, is not entitled to recover. As I have said heretofore, the law as declared both by the Supreme Court of the United States and by the courts of the State of New York seems to be in

complete accord on the point that fraud is the essential foundation for the rule in regard to unclean hands.

■ Was plaintiff in the case at bar guilty of fraud? Did it make any misrepresentation on the basis of which it undertook to sell or did sell its products? I think not.

When plaintiff went into the dress manufacturing business, when the three gentlemen I have named got together and planned the business, according to the evidence they knew nothing about and had never even heard of Alfred Dunhill of London ever having been engaged in producing or selling dresses. As matter of fact also, at the time plaintiff, as the original corporation, began business in August, 1935, Alfred Dunhill of London was not only not engaged in but had previously entirely quit the dress business.

As proved by defendant itself, when it produced and introduced in evidence eight trade-marks belonging to outsiders using the name Dunhill or Dunhills, seven of these were senior in age to plaintiff's trade-mark. It should be noted also that the seven for a varying number of years preceding 1935 had employed their trade-marks without objection or interference by Alfred Dunhill of London.

Defendant argues that by using the name Kay Dunhill plaintiff was representing that it was associated or connected with Alfred Dunhill of London. On what ground can that charge be maintained? If plaintiff took the name from someone else, why attribute the source to Alfred Dunhill of London rather than to a holder of one of the then existing seven outsider trade-marks which used Dunhill or Dunhills as a trade-mark?

Defendant urges that it should be inferred that Alfred Dunhill of London was the source because, when plaintiff adopted it, the name Dunhill had been rendered prominent by Alfred Dunhill of London and by some of those back in England with whom Alfred Dunhill of London was or had been associated.

It should not be overlooked, however, that both Dunhill in England and Alfred Dunhill of London in this country were or had been principally concerned and associated with smokers' articles (such as pipes and tobacco). The evidence clearly indicates, if it does not conclusively show, that every other article with which they ever had been associated was merely incidental.

So also the evidence does not show, or at least does not satisfactorily show, that they or either of them had gained substantial prominence or good will with respect to any such article outside of the field of smokers' articles. I recall no fact evidence which, with any significance whatever, associated the name Dunhill with anything except smokers' articles.

It is true that there were some vague claims that, outside of smokers' articles, what some English Dunhill or what Alfred Dunhill of London produced or sold was the "best" in the world. The opinion so expressed, however, was not backed up by facts and to me is not impressive. Cf. The Conqueror, 166 U.S. 110, 131, 17 S.Ct. 510, 41 L.Ed. 937.

Even though, however, any English Dunhill or Alfred Dunhill of London possessed the standing of prominence claimed by defendant, why ascribe the selection by plaintiff of the Dunhill name to that prominence if it grew out of the smokers' branch of business, instead of ascribing to it some of the outsiders mentioned above who had the name Dunhill in a trade-mark?

One may suspect that prominence of the English people or of the concerns with which they were associated in this country named Dunhill led plaintiff to choose the word Dunhill for inclusion in its corporate name and in its trade-mark. But suspicion is not proof. Furthermore, as I see the matter, there is no reliable evidence on which I can rest an inference that the suspicion is well grounded. The testimony is an unambiguous denial by plaintiff that it was induced or influenced to select the name Dunhill or the name Kay Dunhill by the eminence or the accumulated good will of any one having the name Dunhill or with the hope of advantage being gained by the standing of or by what had been done by any one with the name.

One of the witnesses said that the three organizers conferred and eventually selected the name of plaintiff and its trade-mark. In substance the statement is that in canvassing names they used directories; what they desired was a name which, by its form, would be indicative or suggestive of an attractive young female or that in substance; that they were looking for a well-sounding name which would be agreeable, and yet was mythical or fanciful; and that they wanted the name to create the impression that the dresses plaintiff was selling

were appropriate for a person of that general type.

It was also testified that after hitting on the surname Dunhill, the first name Kay was taken partly because suitable for the purpose of the organizers and partly as a compliment to one of the male organizers whose name began with the letter K.

Whether, however, we accept all details of what is claimed by plaintiff with respect to the choice of a name, as I feel it certainly cannot be gainsaid that there is no evidence which would warrant a finding that in the choice or use of the name Dunhill or the name Kay Dunhill there was any fraud or misrepresentation on the part of plaintiff. If that be true, then the defense of unclean hands cannot be sustained.

Defendant advances a good many arguments in support of its contention. These will be considered.

(1) Defendant's counsel relies on the case of Alfred Dunhill of London, Inc., v. Dunhill Shirt Shop, Inc., D.C., 3 F.Supp. 487. There Judge Coxe said: "The only conceivable reason for the use of the name 'Dunhill' by the defendant is to trade on the reputation and good will of the plaintiff."

Because of this statement defendant in the case at bar insists that I should find that the sole reason of plaintiff for choosing the name "Dunhill" is to enable it to profit at the expense of the "reputation and good will" of Alfred Dunhill of London. There are several reasons which, when taken together, persuade me that I would not be justified in making the finding asked by defendant. These are:

(a) The complainant before Judge Coxe was the owner of the right alleged to have been invaded. The owner of such right here, however, is a stranger to the litigation and to the defendant before me. As I understand the case, in National Picture Theatres v. Foundation Film Corp., 266 F. 208, the Circuit Court of Appeals for the Second Circuit held that there should be no recovery in a suit of the kind last mentioned. There it was said at page 211 of 266 F.:

"The court below rightly gave no weight to the defense based on Byers' registration of a play, named as is defendant's. Whatever may be Byers' rights, unfair competition is a trespass, and no trespasser can justify by setting up the right of one to whom he is a legal stranger."

(b) If what Judge Coxe said in the quotation from him above be deemed intended to mean that he thought the Dunhill Shirt Shop (the defendant of whom he was speaking) was guilty of fraud, without knowing all the evidence in that case I am unable to form an opinion as to whether the evidence in the case at bar would be as strong against plaintiff as was the evidence against Dunhill Shirt Shop. In order properly to pass on a charge of fraud, manifestly it would be necessary to take account of all the evidence.

(c) Apparently also Judge Coxe was influenced by the Dunhill Shirt Shop "in substance" admitting the charge against it. He says that in its answering affidavit that concern stated that it chose the name Dunhill "because we [Dunhill Shirt Shop] wanted a name for our men's habedashery shop that would be associated with 'the English' because of that people's great reputation in turning out well dressed men." It may well be that Judge Coxe was influenced by this admission to adopt the conclusion he reached. There is no such admission by plaintiff in the case at bar. On the contrary, there is a square denial, backed by testimony.

(d) As already pointed out, Alfred Dunhill of London abandoned selling dresses in July, 1935. So also it has ignored the matter since October, 1935. All this was more than six years ago. Plaintiff has never gone into any field which previously had been occupied by nor manufactured or sold dresses of a class previously sold by Alfred Dunhill of London. In the meanwhile, following service of the infringement notice in October, 1935, plaintiff has gone ahead, spent money and made a success of its business.

It seems to me that, on the facts of the present case, such delay on the part of Alfred Dunhill of London would constitute laches which would bar recovery if it were now to undertake to enjoin use of the name "Dunhill" by plaintiff. If so, then surely defendant is not now entitled to set up a right, if there ever was a right, formerly belonging to Alfred Dunhill of London.

(2) There has been a good deal of talk during the trial about the doctrine of natural expansion. As I see it, however, there are no facts here which would bring the doctrine into this case and that, therefore, there is no occasion to go further with it. My impression is that defendant's counsel is in accord with that view.

936

As will have been observed from reading the decisions, the courts are reluctant to apply the doctrine. They say, and I think it is true, that unless they be exceedingly careful about extension of the doctrine, it would lead into monopoly. Plainly, it is the duty of the courts to avoid sustaining a monopoly unless it be demanded by law.

As I understand S. C. Johnson & Son v. Johnson, 2d Cir., 116 F.2d 427, in principle it supports my conclusion that in this case there can be no application of the natural expansion doctrine in order to strengthen defendant's case.

(3) It may be urged that plaintiff has no interest in the name "Dunhill." I shall not go into whether that proposition be right or wrong; but even if true, it is not the test which should be applied here. Cf. S. C. Johnson & Son v. Johnson, 2d Cir., 116 F.2d 427, 429; Higgins Co. v. Higgins Soap Co., 144 N.Y. 462, at page 469, 39 N.E. 490, 27 L.R.A. 42, 43 Am.St.Rep. 769.

The basis of the right to complain is that a person who has established a trade name and carried on his business under it is entitled to protection against the invasion of the name by some other person who assumes it, or an approximation of it, in such way as to induce persons who deal with the latter to believe that they are dealing with the person who has used and given reputation to the name. The right to relief does not rest merely on the adoption of the name, however, but "grows out of its use." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, at page 97, 39 S.Ct. 48, 51, 63 L.Ed. 141.

I conclude, therefore, that (1) defendant has infringed plaintiff's trade-mark and has competed unfairly with plaintiff; (2) plaintiff has not come into court with unclean hands and is entitled to recover; (3) plaintiff is entitled to an injunction substantially in the terms asked for in the first and second prayers of the complaint; (4) plaintiff is entitled to recover from defendant damages and profits substantially as asked for in the third prayer of the complaint; and (5) plaintiff is entitled to costs.

Let plaintiff have judgment in conformity with this opinion, including a provision therein for the appointment of a master to hear and report on the amount of damages and profits to which plaintiff is entitled.