FIELD ENTERPRISES EDUCATIONAL CORPORATION, Plaintiff,

v.

COVE INDUSTRIES, INCORPORATED, Defendant.

No. 66-C-742.

United States District Court
E. D. New York.

March 20, 1969.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for plaintiff, Jay H. Topkis, Neale M. Albert, George P. Felleman, New York City, of counsel.

Jerome Bauer, Mineola, for defendant, Herbert H. Goodman, New York City, of counsel.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Field Enterprises Educational Corp. (Field), publisher of the "World Book Encyclopedia," seeks an injunction, damages and an accounting in this action for trademark infringement and unfair competition against Cove Industries, Inc. (Cove), publisher of the "Illustrated World Encyclopedia." Cove attacks the trademark's validity, asserts laches, and claims lack of infringement; it counterclaims for a declaration that Field's Trademark Registrations are void. For the reasons indicated below, the trademark is valid but affirmative relief for infringement or unfair competition is not warranted.

## I. FACTS

Field or its predecessors have published a "World Book Encyclopedia" uninterruptedly since 1917. "Illustrated World Encyclopedia" has been published by defendant or its predecessors since 1959.

Field's trademark, "World Book," was entered on the Principal Register of the United States Patent Office as a mark for books on December 17, 1963, with Registration Number 761,657. The same phrase was entered as a trademark for books and publications on August 24, 1965, with Registration Number 794,812.

There have been at least eight other encyclopedias in which the word "World" appears as part of the title (the dates during which these reference works were published, or are being published, are given in parentheses): "New World Cultural Library" (1962–1964); "New Wonder World Encyclopedia" (1959–1962); "Our Wonder World" (1914–1930); "Our Wonderful World" (1955–present); "Universal World Reference Encyclopedia" (1963–present); "World Educator Encyclopedia" (1963–present); "World Scope Encyclopedia" (1945–1963); "World Wide Encyclopedia" (unknown–present); "World Wide Illustrated Encyclopedia" (1935–1939); and "World University Encyclopedia" (1963–present). See Reference Books Research Publications, Inc., General Encyclopedias in Print, 1965, at 42 and passim. (1965). "New World Cultural Library," "New Wonder World Encyclopedia" and "Our Wonder World" appear to be separate titles for the same work which was also published under the title "New Wonder World." Id. at 46.

All told, at the time of the first registration by Field, there were at least five other encyclopedias then being published which incorporated the word "World" in their titles. "World Book" appears to have acquiesced in the use of the word "World" by other publishers throughout its publishing history. In addition, disclaimers of trademark rights to the exclusive use of the word "World" were made at trial.

Prior to first use by plaintiff in 1917, the "World Book Company" of Yonkers, New York used the term. But this prior use, it is fair to infer from the evidence, was abandoned many years before Field applied for registration.

"World Book Encyclopedia" presently sells at prices ranging between one hundred eighty and two hundred dollars; within the past ten years, it has not sold at a price lower than one hundred forty dollars. It is sold on a "door-to-door" basis by salesmen dealing with individual purchasers. Field controls the distribution of its product until it reaches the ultimate consumer.

At the present time, the price of Cove's "Illustrated World Encyclopedia" is approximately forty dollars. It is sold in department stores and other retail outlets. Before 1964 it was sold from house-to-house at approximately one hundred ten dollars. For a short period in 1964 and 1965, after the selling price was reduced from $109.90 to $34.95, Cove's publication was advertised in "publisher's sensational closeout sales" as the same "famous, highly rated Illustrated World Encyclopedia" formerly "Sold Door to Door."

"Illustrated World" is published in at least one edition that is very similar to the "Aristocrat" edition published by "World Book." Both are bound in yellow

parchment fabric with a green and gold spine. Both are heavily illustrated. "World Book" is published in twenty volumes, "Illustrated World" in twenty-one. Both utilize contributors with scholarly backgrounds, and both print the names of these contributors on the title pages of their publications. Both are arranged alphabetically. Physically, the only significant difference lies in the size of the volumes: "World Book" is substantially thicker, and slightly taller.

The differences between the two, beyond superficial physical appearance, are striking. "Illustrated World Encyclopedia" is written for readers at the elementary or junior high school levels. "World Book," by contrast, attempts to appeal to all age groups above the grade school level; it is not recommended for use by children in lower elementary grades. Reference Books Research Publications, Inc., General Encyclopedias in Print, 1965, at 15 (1965). Field conducts an extensive and continuous revision program, and publishes an updated supplement annually. In addition, the entire work is reprinted semiannually, with current changes incorporated in the text. This is not the case with "Illustrated World," although changes are made in later editions.

In short, it may be said that as to content, format and accuracy, the "World Book" is obviously superior to the "Illustrated World Encyclopedia" for those who have successfully completed grade school. In this connection, "World Book" is:

"RECOMMENDED by the Subscription Books Committee of the American Library Association both as a children's and young people's encyclopedia for use in the home and in school and public libraries, and as a general encyclopedia for home use serving adults for ready reference. RECOMMENDED FOR FIRST PURCHASE in the Standard Catalog for High School Libraries and the Children's Catalog. ON THE APPROVED LIST OF EVERY STATE AND PROVINCE maintaining such lists." Reference Books

Research Publications, Inc., General Encyclopedias in Print, 1965, at 16 (1965).

The "Illustrated World" was much less highly thought of in educational circles. *Id.* at 54.

Field has expended an estimated $17,-000,000 over the last ten years for advertising products bearing the "World Book" trademark; it has sold three and a half to four million sets during this period. Although Cove has also advertised, its expenditures and sales have not approached those of Field.

Prior to 1965 there would have been some danger of confusion of the two works on the part of an unwary purchaser. With the reduction in price and change in marketing methods of Cove's product, the possibility of confusion has become remote. Reference has already been made to the "closeout" advertising in 1964 and 1965. During this transitional period it was not unlikely that at least some of Field's customers concluded that the superior product they had bought, or were contemplating buying, was the same as the one being "closeout" at some one hundred dollars less than the "World Book" price. There has been no evidence that this source of confusion existed after 1965.

Field was aware of Cove's use of the title "Illustrated World" and a similar format at some time prior to 1960, possibly in 1958 or 1959. Without protest, Field permitted Cove to continue on its course for over five years before bringing suit. No explanation has been offered for this delay. Since it is likely that defendant was aware of the extensive use by other publishers of the word "World," it is reasonable to conclude that Cove considered itself justified in the use of its title "Illustrated World Encyclopedia." There has been no evidence of bad faith or intent to defraud on the part of Cove.

## II. PRESUMPTION OF TRADE-MARK VALIDITY

 Use of a registered trademark for a continuous five-year period after

registration and while "there is no proceeding involving said rights pending," is required before the mark becomes incontestable and before there is a conclusive presumption of a registrant's exclusive right to use a registered trademark. 15 U.S.C. §§ 1065, 1115(b). Since "World Book" was registered less than five years before this action was commenced, registration is merely *prima facie* evidence of Field's exclusive right. Cove is not precluded from proving "any legal or equitable defense"—including prior use, use of non-protectable descriptive words and lack of similarity— "which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a).

## III. TRADEMARK INFRINGEMENT

### A. *Prior Use*

■ Unless abandoned, prior use of a word or phrase vitiates any claim to exclusive rights by a later user. Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144 (1893).

■ In light of the extensive use of the word in other encyclopedias, prior use prevents a successful claim of exclusive rights to "World." Assertion of rights in the phrase "World Book" is not precluded for this reason, however, unless there was earlier continued use of this specific combination of words. Since the phrase "World Book" has not been used for many years by any other company in a related field, use by anyone rather than Field has been abandoned for purposes of the trademark statutes. Gruelle v. Molly-'Es Doll Outfitters, 94 F.2d 172, 175 (3d Cir. 1937), *cert. denied,* 304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1528 (1938). Prior use does not invalidate plaintiff's trademark.

### B. *Use of Descriptive Words*

■ A fundamental concept in the law of trademarks and trade names is that known as "hierarchy of trademarks." Farmers' Educational & Coop. Union of America v. Farmers' Educational & Coop. Union of America, Iowa Div'n, 141 F.Supp. 820, 824 (S.D.Iowa 1956), *aff'd,* 247 F.2d 809 (8th Cir. 1957). Some words, fanciful or coined, bear so little relation to the product *they identify that they are considered* entitled to protection against all users. These are commonly denominated "strong" marks. Others are either descriptive or closely related to the product which they identify, and are therefore entitled to no protection unless they have acquired a secondary meaning—that is to say, unless the public has learned to identify the name of the product with its source or origin. Warner Bros. Pictures v. Majestic Pictures Corp., 70 F.2d 310 (2d Cir. 1934); Fishler v. Twentieth Century-Fox Film Corp., 159 F.Supp. 215 (S.D.Cal.1958). The law seeks to protect the reputation of the manufacturer and the interest of the public in not being deceived as to the source of the goods. 3 Callman, Unfair Competition and Trade-Markes 1057 (Supp. 1965); Clairol, Inc. v. Gillette Co., 270 F.Supp. 371, 376 (E.D.N.Y.1967), *aff'd* 389 F.2d 264 (2d Cir. 1968).

The title "World Book" is neither fanciful nor coined. It relates descriptively to the work itself, indicating that the publication makes available the relevant knowledge of the world; it succinctly summarizes the dictionary definition of an encyclopedia:

"1 A work containing information on all subjects, or exhaustive of one subject; a cyclopedia. * * * 3 The entire circle of knowledge." Funk & Wagnalls Standard Dictionary 417 (Int'l ed. 1966).

The "weakness" of the title is emphasized by the proliferation of encyclopedia names incorporating the word "World."

■ Unless a weak title has attained some secondary meaning which would cause the public to identify the source of the work, there could be no valid trademark. Alexander v. Irving Trust Co., 132 F.Supp. 364, 368 (S.D.N.Y.), *aff'd,* 228 F.2d 221 (2d Cir. 1955), *cert. denied,* 350 U.S. 996, 76 S. Ct. 545, 100 L.Ed. 860 (1956). Such a

secondary meaning entitled to protection under the trademark laws has been acquired by the phrase "World Book." Long and continued use of the name, widespread sales of the book, as well as the large sums spent for promotion and advertising, support this conclusion. *See* Annot., 150 A.L.R. 1067, 1083 (1944). Moreover, the approval which has been accorded the work within educational circles increases the likelihood of public familiarity. A highly praised work is more likely than not to be known to the public by name.

## C. *Similarity*

 In addition to showing that its trademark is entitled to protection, the plaintiff must also show that it has been infringed. On the claim of trademark infringement the relevant inquiry is whether the material protected by trademark has been infringed by the defendant's choice of title—that is to say, is there a confusing similarity between the names "World Book" and "Illustrated World?"

Since the only word that is identical in the titles is "World," it may be assumed that it is the use of this word which the plaintiff finds objectionable (either alone or in conjunction with "Illustrated" or "Encyclopedia," or both). As already pointed out, this word is extremely "weak," in the trademark sense. *See, e. g.,* Palmer v. Gulf Pub. Co., 79 F.Supp. 731 (S.D.Cal.1948) ("World Petroleum"); *cf.* Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F.Supp. 382 (S.D.N.Y.1966) ("How and Why" trademarks not infringed by "How and Why Wonder Books").

 It is undesirable that words in common use be given a monopoly under the trademark laws. For this reason, in determining whether there has been infringement, a distinction is made between primary and secondary uses. While the secondary use may be protected, the use of a common word in its primary sense may not be. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F. Supp. 861 (S.D.N.Y.1962), *aff'd,* 312 F.

2d 125 (2d Cir. 1963); *see also* Barton v. Rex-Oil Co., 2 F.2d 402, 404, 40 A.L.R. 424 (3d Cir. 1924). Here, it is apparent that the word "World" has been used by the defendant in its primary sense, *i. e.,* pertaining to the earth and its contents. There has been no trademark infringement.

## IV. UNFAIR COMPETITION

 Although there has been no infringement, this conclusion does not dispose of the claim against Cove for unfair competition. Trademark law must be distinguished from the law of unfair competition. The latter, since it protects more than a name, may give broader protection. As Judge Bonsal has pointed out:

> "The essential element of a trademark is the exclusive right of its owner to use a word or device to distinguish his product. On the other hand, a claim of unfair competition considers the total physical image given by the product and its name together." Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 863 (S.D.N.Y. 1962), *aff'd,* 312 F.2d 125 (2d Cir. 1963).

 The law of New York is to be applied in a claim for unfair competition. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 780 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). The decisions of the Supreme Court in Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed. 2d 669 (1964) do not change this rule. In *Sears* and *Compco,* the Court was concerned about the use of state unfair competition laws to extend the effective term of patent protection. While these two cases may apply by analogy to the use of common law copyright (Goldstein, Federal System Ordering of the Copyright Interest, 69 Colum.L.Rev. 49 (1969)), they have no bearing on trademarks. Since the term of federal trademark protection is theoretically perpetual

(assuming no abandonment), use of state unfair competition law to protect trademark registrants does not conflict with the federal policy "of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain." Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 237, 84 S.Ct. 779, 782 (1964). Where there is no federal policy in favor of creating a body of material in the public domain, there can be no conflict created by a state policy restricting unfair competition by granting greater protection than that available under federal trademark law.

■■■■ State law requires more than simple forbearance in use of a competitor's name. "The critical question is whether customers are, or may be, misled." Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 863 (S.D. N.Y. 1962), aff'd, 312 F.2d 125 (2d Cir. 1963). See also Coca-Cola Co. v. Snow Crest Beverages, 64 F.Supp. 980, 985 (D.Mass.1946). New York courts ask whether there is sufficient similarity between products to lead to a reasonable likelihood of confusion among purchasers. Fischer v. Blank, 138 N.Y. 244, 33 N.E. 1040 (1893); Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D. 2d 227, 159 N.Y.S.2d 606, 610, reargument denied, 3 A.D.2d 833, 161 N.Y.S. 2d 829 and 3 A.D.2d 833, 161 N.Y.S.2d 830 (1st Dep't 1957). Where there is a substantial similarity in packaging or advertising, with a likelihood of misappropriation of good will or misrepresentation as to source, and a resultant possibility of confusion in the trade, the courts may grant relief. Distillerie Flli Ramazzotti, S.P.A. v. Banfi Products Corp., 52 Misc.2d 593, 276 N.Y.S.2d 413, 421–422 (Sup.Ct.1966). Prospective purchasers are "not required to carry in [their] memory, at all times, the exact details of the package so that [they] will be able, at the time of purchase, to differentiate such two items." Id. at 422. Such criteria as price, degree of competition, methods of distribution, advertising and identifying names, marks or symbols, as well as outward appearance, must be considered.

■■■■ Had the advertising of defendant's work as one formerly selling from door-to-door at over one hundred ten dollars continued, there would have been substantial confusion. Such publicity, coupled with the high degree of similarity between the works, constituted unfair competition. But this advertising was discontinued even before this action was commenced. Confusion since 1965 has not been shown by any proof of experts, surveys or individual complaints. In light of the different methods of distribution, sales price and quality, it is doubtful that the public will now mistake the two encyclopedias.

## V. REMEDY

### A. Damages and Accounting

Field has requested both damages and an accounting against Cove for loss of profits caused by unfair competition.

■■■■ Relief in the form of damages or an accounting is not granted as a matter of course. Where it appears clear that the loss of property emanating from the unfair competition would be entirely speculative, an accounting is not justified. Cf. Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 3 A.D.2d 227, 159 N.Y.S.2d 606 (1st Dep't 1957), reargument denied, 3 A.D. 2d 833, 161 N.Y.S.2d 829 and 3 A.D.2d 833, 161 N.Y.S.2d 830 (1st Dep't 1957). Here, the possible unfair competition was extremely limited in time; there is proof of only a few instances where prospective purchasers might have been misled by the 1964–65 advertisements. No loss of sales has been shown. The remedies of damages or of an accounting are unjustified; Field's damages were at the most de minimis.

■■■■ Additionally, Field is estopped from obtaining an accounting for profits by laches. Defendant's good faith, plaintiff's delay, the equities of the case, and the implication of abandonment of a demand for an accounting "in the

absence of its being urged" at the trial by any evidence, all support denial of monetary relief. Victory Chain, Inc. v. Rosenberg, 10 Misc.2d 382, 174 N.Y.S. 2d 46, 53 (Sup.Ct.1958). See also Shaffer v. Rector Well Equipment Co., 155 F. 2d 344 (5th Cir. 1946); Fruit Industries v. Bisceglia Bros. Corp., 101 F.2d 752, 754 (3d Cir. 1939); Kay Dunhill, Inc. v. Dunhill Fabrics, Inc., 44 F.Supp. 922, 935 (S.D.N.Y.1942); Cohn & Rosenberger v. Kaufman & Ruderman, 280 App. Div. 241, 113 N.Y.S.2d 62 (1st Dep't 1952).

■ Finally, where the defendant has expended money in advertising its product and attempting to build up good will for its own encyclopedia during the years when Field remained quiescent, it would be unjust and inequitable to require compensation for possible minor injuries in the past.

### B. *Injunction and Declaratory Judgment*

As already suggested, Cove's unfair advertising campaign of 1964–65 does not seem to have been repeated and apparently resulted from a non-recurring change in its merchandising practices. Ordinarily this conclusion would suggest terminating the case by declaring Field's registrations valid against this defendant and denying all other relief. But both parties remain in active competition with respect to an overlapping market at approximately the junior-high school level and the physical similarity of their volumes provides a continuing danger that defendant or its retailers may relapse into some form of the earlier advertising campaign.

■ The collateral estoppel effect of a limited declaratory judgment in a new action for unfair competition would not be completely clear in view of changed circumstances required to be alleged and proved in the new action. Restatement of the Law of Judgments § 68(2) and Comments j, o, and q. *See also* Speed Products Co., Inc. v. Tinnerman Products, Inc., 222 F.2d 61, 67–68 (2d Cir.

1955) (collateral estoppel not applied); Seven-Up Co. v. Bubble-Up Corp., 312 F. 2d 472, 50 CCPA 1012 (1963) (collateral estoppel applied to doctrine of laches); Gottesman v. General Motors Corp., 221 F.Supp. 488, 491–92 (S.D.N.Y.1963) (distinction between ultimate facts and mediate data).

■ While, in a new action, the court could take judicial notice of the instant litigation, courts have generally been reluctant to extend the doctrine to specific findings of fact. *Cf.* 9 Wigmore, Evidence 570 (3d ed. 1940) ("practical notoriety and certainty of the fact"); McCormick, Evidence 702 (1954) (informal presentation approved); South Shore Land Co. v. Peterson, 226 Cal.App. 2d 725, 38 Cal.Rptr. 392, 402, 403 (1964) (prior proceeding in federal court noticed); Meck v. Allen Properties, Inc., 206 Misc. 251, 132 N.Y.S.2d 674 (Sup.Ct. 1954) (prior action between same parties relied upon for map used by court). *But cf.* Shuttlesworth v. City of Birmingham, Alabama, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ("surrounding relevant circumstances" in civil liberties dispute).

■ An effective procedure, cheaper for both parties than a new action should unfair competition be threatened again, would be to retain foot-of-the-decree jurisdiction. Speedy relief by way of a specific injunction directed to particular dangers could then be obtained by a motion made by either party in the present action brought on by order to show cause. Such a practice represents a slight departure from normal judicial usage but is supported by the general power of federal courts as inheritors of the flexible authority of equity. Rules of Civil Procedure, Rule 60(b) (5); United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932); 7 Moore's Federal Practice ¶¶ 60.16[6], 60.26[4].

■ Where, as here, a full trial has been required to determine both relevant and material facts and the parties can benefit from a judgment, a

dismissal for mootness is not mandated. *See* Borchard, Declaratory Judgments 428–30 (2d ed. 1941).

> "[W]hen coercive relief only is sought but is deemed ungrantable or inappropriate, the court may *sua sponte,* if it serves a useful purpose, grant instead a declaration of rights." Original Committee Note of 1937 to Rule 57, 6A Moore's Federal Practice ¶ 57.01 [2].

If there is a substantial possibility that the act sought to be enjoined may be repeated, the matter is not necessarily mooted. Papaliolios v. Durning, 175 F. 2d 73, 75 (2d Cir. 1949); 6A Moore's Federal Practice ¶ 57.13. There is some discretion to weigh the continuing needs of the parties.

The major disadvantage of retaining open ended jurisdiction without a specific decree is that the parties may be more inhibited from acting than they would otherwise be. Insecurity resulting from ambiguity should be avoided if possible. International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947). In the antitrust and civil rights fields, it is not uncommon to grant a decree ordering a new course of conduct or enjoining future specific activities not then threatened. United States v. United States Gypsum Co., 340 U.S. 76, 88, 89, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950), *motion to amend denied,* 340 U.S. 909, 71 S.Ct. 289, 95 L. Ed. 657 (1951); International Salt Co. v. United States, 332 U.S. 392, 398–401, 68 S.Ct. 12, 16–18, 92 L.Ed. 20 (1947); United States v. Jefferson County Board of Education, 372 F.2d 836 (5th Cir. 1966); *corrected,* 380 F.2d 385 (5th Cir. 1967), *cert. denied sub nom.,* Board of Education of City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed. 2d 104 (1967). This doctrine is not limited to disputes of broad public interest. In any equity case once danger is revealed, the power to protect against foreseeable abuse is broad.

Accordingly, counsel for the parties will arrange to confer with each other in an attempt to work out details of a judgment, subject to Court approval, designed to insure against future unfair competition. If they cannot agree the Court will meet with the attorneys and issue an appropriate decree.

So ordered.