CONSTRUCTION INDUSTRY ASSOCIATION OF SONOMA COUNTY, a California nonprofit corporation, et al., Plaintiffs,

v.

The CITY OF PETALUMA, a California Charter City, et al., Defendants.

No. C–73 663 LHB.

United States District Court,
N. D. California.

April 26, 1974.

Arata, Misuraca & Clement, Malcolm A. Misuraca, James L. Beyers, Craig M. Thomas, Santa Rosa, Cal., for plaintiffs; Joseph D. Joiner, Berkeley, Cal., of counsel.

Robert T. Anderson, Oakland, Cal., Edouard E. Robert, Petaluma City Atty., Petaluma, Cal., for defendants.

LLOYD H. BURKE, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action was heard without a jury from January 14 through January 18, 1974. Arata, Misuraca & Clement, Malcolm A. Misuraca, James L. Beyers, Craig M. Thomas and Joseph Joiner, of counsel, appeared for the plaintiffs. Sturgis, Den-Dulk, Douglass & Anderson, Robert Anderson and Edouard E. Robert, of counsel, appeared for the defendants. The action was tried, submitted without argument; and the court made its oral decision (in favor of plaintiffs) at the conclusion of trial. The court finds from the evidence that:

### FINDINGS OF FACT

1. The city of Petaluma, California, is within modern-day commuting distance of San Francisco and is a part of the San Francisco Bay Area metropolitan region. Until recently, Petaluma was known primarily for its dairy and poultry resources.

2. The defendants, Helen Putnam, Robert A. Brunner, John W. Cavanagh, Robert A. Daly, James L. Harberson, Fred V. Mattei, and William A. Perry, are the members of the Petaluma City Council. All elements and employees of the defendant city are under their control.

3. Through the early 1960's Petaluma's government operated under the prevailing assumption that "growth is good." Its planning provided generously for housing "developments" and eventually permitted the eastern portion of the city to become densely populated by a sea of tract homes. Growth was uncontrolled.

4. In 1962, the city officials of Petaluma studied its growth patterns and concluded that, if current trends continued, by 1985 the city would have a population of 77,000; it would cease to be a "rural" community. Subsequent growth rates confirmed the predictions; and Petaluma's population increased dramatically until the early 1970's. From 1964 through 1971, the following numbers of housing units were completed in Petaluma:

| | | | |
|---|---|---|---|
| 1964 | 270 | 1968 | 379 |
| 1965 | 440 | 1969 | 358 |
| 1966 | 321 | 1970 | 591 |
| 1967 | 234 | 1971 | 891 |

5. In 1970 and 1971, the city approved approximately 2,000 units for future construction. This number of units represents the fair measure of the market and demographic demands for housing in Petaluma. Since the 1970–1971 period, market demand has been and continues to be substantially in excess of five hundred units per year.

6. With the accelerated growth figures of 1970 and 1971, the citizens of Petaluma began to question earlier judgments about the desirability of growth for its own sake; and they set about quite openly to curb the population

growth in their city. In early 1971, a "citizen's committee", aided by a firm of professional planners, drafted a suggested "policy on growth" for Petaluma. One tool used in arriving at their statement of policy included the sending of questionnaires to approximately 10,000 residents of the city. The great majority of the returned questionnaires indicated that the citizens of Petaluma wanted to limit the increase of future residents.

7. In accordance with growing community sentiment, the city council adopted an official development policy in June, 1971, the policy statement itself having been the one drawn up by the citizens' committee and the city planning staff. The statement, entitled "Official Statement of Development Policy for the City of Petaluma", reflected the local sentiment expressed above. As a preamble the statement asserted that

"In order to protect its small town character and surrounding open spaces, it shall be the policy of the City to control its future rate and distribution of growth . . . ."

8. The city council implemented the official growth policy of June, 1971, and adopted the "Petaluma Plan," which includes, among other items, the following ordinances:

(a) Environmental Design Plans and Maps, Petaluma Resolution No. 6008 N. C.S.

(b) A Residential Development System, Petaluma Resolution No. 6113 N.C. S.

(c) The Petaluma Housing Element, Petaluma Resolution No. 6126 N.C.S.

(d) A proposed breakdown of approximately 2,500 units to be allocated by the plan for the years 1973 through 1977.

(e) Rules and Regulations for business of the Residential Development Board (the "RDEB").

9. The city council intended in enacting the "Petaluma Plan" to limit Petaluma's demographic and market growth rate in housing and in the immigration of new residents. The plan did have the intended effect in a number of respects, of which the following are the most significant:

(a) The city limited new housing units to approximately one-third to one-half of the demographic and market demand of the 1970–1971 period.

(b) The city created an "urban extension line," i. e., an ultimate boundary intended to mark the outer limits of the city's expansion for twenty or more years. Within this perimeter, the city used density limitation and other techniques to set a maximum population of the city at approximately 55,000 as against the 1962 projection of 77,000 by 1985. Such a limitation is a substantial interference with demographic and market demand for housing and the immigration of new residents. The 1962 general plan estimate of 77,000 residents in 1985 was a reasonable estimate of those demands on the housing market, and it continued to be reasonable in 1970 and 1971.

(c) The area within the "urban extension line" was sufficient at the city's chosen densities for growth for the twenty year planning period only at the 500 unit annual limitation, not at natural demographic and market demand rates. The effect of the "urban extension line" is to limit "excessive" population growth, which limitation was the defendants' purpose. If the 500 unit rate limit were removed, the limit on population set up by the "urban extension line" would still act as a substantial deterrent to travel and commerce.

(d) The city refused, for fifteen or more years, to annex or to extend city facilities to land outside the "urban extension line." The city solicited the assistance of the county and the Local Agency Formation Commission ("LAFCO") to prohibit residential growth outside of the "urban extension line." Thus, the extension line inhibited immigration not only into Petaluma, but also into its surrounding areas.

(e) Permits for the building of the limited number of units are granted

and/or evaluated by the residential development evaluation board (the "RDEB"). The rating system employed is an intricate one, which establishes a competitive situation between the proposed applications. Although we do not understand plaintiffs to attack the rating concept itself, they do contend that the application of this particular system's terms resembles a "Catch-22" type of operation; apparently nobody really knows what regulations will be applied, or how, or by whom. Plaintiffs argue that the merit rating system, as employed by these defendants, is actually a hazing system intended to discourage unwanted builders from acquiring permission to build.

10. Although the defendants contend that the "Petaluma Plan" is intended to last only through 1977, official attempts have been made to perpetuate the plan through 1990 at lest. Such attempts include the annual 500 unit building limitation, the urban extension line, and the limitation of available facilities. For example, the city has purposefully limited its contract with the Sonoma County Water Agency, a major supplier of water to the city, to 9.8 million gallons of water per day through the year 1990. This flow is sufficient for a population of 55,000. By limiting its public facilities, the city intended to serve a population lower than the market and demographic growth rates would produce, to restrict the travel of new residents into Petaluma, and consequently to limit the number of housing units that might be constructed.

11. Housing in Petaluma and elsewhere in the San Francisco metropolitan region is produced substantially through goods, services and communication devices in interstate commerce.

12. The "Petaluma Plan" prevented the construction of approximately one-half to two-thirds of housing units that market and demographic growth forces would have demanded for Petaluma during the 1973–1977 period and the subsequent extension of the plan into 1990. The people in need and desirous of housing were and will be forced to turn to other areas within the region for accommodation. Such persons consist of Californians as well as out-of-state immigrants.

13. Although defendants contended that, as a matter of law, this court may not inquire into the motives for the implementation of the growth limitation policy, they have introduced evidence which is designed to prove that the growth curbs were imposed because of the inadequacy of the city's water and sewage treatment facilities and not to keep others from moving into Petaluma. Without intending to resolve the initial legal position taken on the point, we find that the assertions made are not true.

When the "Petaluma Plan" was conceived in 1971, the city faced no immediate, serious or unusual difficulty in using or expanding the capacity of its public facilities to serve existing demographic and market growth rates in housing. The city could have continued to meet the demands on such facilities made by the growth rate trends of 1970 and 1971 without unusual strain upon such facilities. The city's reference to such alleged inadequacies is no more than an excuse intended to justify the "Petaluma Plan" after its adoption. Specific findings on sewer and water facilities follow:

(a) The city determined in 1965 to add to the capacity of its existing sewage treatment plant, which was first constructed in 1938, then expanded and reconstructed from time to time. In 1965 it had a capacity of 1 million gallons per day for secondary sewage treatment. Between 1965 and 1968, new construction increased the capacity of the facilities to 2.6 million gallons of sewage per day. In wet months the facilities could handle up to 14 million gallons per day, a combined demand of sewage and storm water.

(b) In planning the 1968 addition to the treatment facilities, the city used inaccurate growth projections; and although the ultimate treatment capacity

of the 1968 plant could be expanded to 14 million gallons per day, it was limited to 2 million gallons per day. The city later found that the additional facilities actually increased capacity to 2.6 million gallons per day. The combined capacity of the 1938 and 1968 facilities would not indefinitely keep pace with the growth trends reflected in the 1962 projections, but they were fully capable of being augmented to handle up to 14 million gallons of sewage treatment per day in the 1968 plant.

(c) In 1973, the city began to increase its capacity to treat sewage to 7 million gallons per day. The expansion is to be available in July, 1975.

(d) Based upon city sewage treatment reports which indicate that the per person per day burden on the treatment facilities amounts to between 50 and 100 gallons, the city currently has the capacity to serve approximately 6,000 to 12,000 more persons.

(e) The city is able, at the present time, to return to absorbtion of existing market and demographic growth rates without exceeding the capacity of city facilities. Such facilities are either now in place, under construction, or capable of being augmented by new capacity and at all times will be adequate for anticipated real demographic and market demands.

(f) Nor can the city accurately claim that it currently exceeds regional water quality control standards. Although the water quality control board for the San Francisco Bay Region has required the city ultimately to cease the discharge of treated sewage into the Petaluma River, a schedule has been adopted for the shifting of the point of discharge. Petaluma may easily meet the new discharge standards without disturbing demographic and market residential growth rates. Moreover, the State of California and the federal government have stipulated that the city is in conformance with all applicable water quality standards in its waste water treatment facilities.

(g) The city's water supply is substantially drawn from the Russian River through the Sonoma County Water Agency. The city's demands upon agency sources range between 4.7 million gallons per day in peak summer months, to about one-half that amount in the winter months.

(h) The city controls its water service and has a surplus in excess of $3,000,000 in water funds. The city is currently negotiating the placement of wells in nearby communities for interim use, until the Russian River-Cotati intertie is completed in 1976. The intertie will furnish a substantial amount of additional water to Petaluma.

(i) Petaluma has requested a 9.8 million gallon per day supply of water from the Russian River-Cotati intertie, which, as mentioned above, is to be completed in 1976. Such a request, though not limited by the supplying agency, represents the amount of water which would be necessary through the year 1990, if Petaluma's population limitation plan were to remain in effect. The city may expand its contract by request, and a surplus in the intertie exists for expansion of water supplies into Petaluma.

(j) Since, as well as the intertie, other additional supplies of water will be available in the future, the city is well able to expand at market and demographic rates without a crisis in its water supply.

(k) The city has not established that any of its other facilities is in any way threatened by residential growth at market or demographic rates.

14. Although the parties disagree as to the relevance of the matter, the following findings relate to the probable effects of the growth limitation policy in dispute and the probable effects if such a policy were to spread to the remaining municipalities of the San Francisco metropolitan region.

(a) The San Francisco metropolitan region is generally self-contained and has a unitary housing market. Persons excluded from one suburb do not leave

the region but seek housing elsewhere in the area. Where suburbs not practicing exclusionary growth limitation are forced to absorb not only their own "share" of the population growth, but also the excluding suburb's as well, they tend to retaliate by adopting exclusionary measures of their own. It is appropriate to measure the potential effects that the exclusion practiced by Petaluma would have if it proliferated throughout the region itself.

(b) Limits on the supply of housing in one part of a regional market create increased demand for housing elsewhere in the area. Other areas then have incentives to limit housing.

(c) Limiting housing in the face of static or rising demand increases the cost of private housing and the rent structure of tenant housing. This increase is equally applicable in both the area practicing the exclusion and elsewhere in the region where the rejected demand is felt.

(d) Limits on housing supply in the suburbs tend to keep people who would otherwise move to those suburbs in the center cities.

(e) In any given period, a certain percentage of existing housing is in need of replacement, either because it is obsolete or substandard or because it is destroyed or damaged beyond repair.

(f) If the total housing demand in such a region be frustrated by a policy. that limits the supply of housing to less than demand; certain results will inevitably follow. Substandard and obsolete housing which should be replaced will remain in the market to deal with the high demand and will partially fill it with low quality structures. The overall nature of the region's housing stock will decline. Tenant housing is as subject to this phenomenon as privately owned and occupied housing. Landlords will discover that they may leave substandard housing in the rental market and may ignore its need for maintenance and rehabilitation without suffering high vacancy rates, demand for such housing being unnaturally high.

(g) Growth throughout a metropolitan region takes place unevenly in certain "growth centers," areas having unused capacity which can be tapped or the ability to augment capacity to serve new residents.

(1) Petaluma is such a growth center for the San Francisco metropolitan region.

(2) Such centers serve, among other things, as residential centers for people who work elsewhere in the center cities complex, in other suburbs or in other job centers.

(3) Residential growth in such centers, though larger than in some other cities in the region, is not disproportionately larger in the sense that market, economic, demographic and other forces within the region dictate that growth shall occur in substantial part in growth centers.

(h) If such growth centers curtail residential growth to less than demographic and market rates, as has been attempted in the present case, serious and damaging dislocation will occur in the housing market, the commerce it represents, and in the travel and settlement of people in need and in search of housing. Even in cities in the region that do not qualify as "growth centers," the same exclusion of residential growth would lead to substantially the same adverse consequences, if the exclusion were region-wide.

(i) The public facilities, land, existing social advantages and access to the center cities and to other job centers that growth centers offer to a metropolitan region in need of housing cannot be adequately placed elsewhere to support local and regional housing needs. Although "new towns" could be constructed where none already exists, the initial cost would be prohibitive to build infrastructure, i. e., the basic public facilities necessary to serve the town. Experience in "new town" development has proved that the "front-end facilities cost" in new towns makes them impractical, at least as a source of housing for low and moderate income groups.

(j) It is impossible to force housing out of growth centers and into rural areas, without providing for public facilities. Some public facilities, i. e., fire protection, streets and schools, must be provided by the responsible government. Others, such as septic systems, water wells, and private roads, tend to occupy large amounts of open space to provide for single-family homes. In later years, when septic tanks, water wells and substandard streets decline, the cities are usually forced to add the old rural developments to city services, i. e., sewers, water supplies, and streets, at substantially increased cost over the amount that would have been incurred, if the developments had been originally incorporated into city services.

(k) Moreover, it is not feasible to force housing out of growth centers and into the center cities. The destruction and reconstruction of center city housing raise many problems that have not been solved, except in massive government-sponsored, urban renewal projects —sometimes these have not been successful. Assembly of land ownership for efficient large-scale development is difficult. It is difficult to acquire financing for center-city housing. Construction costs are high, relative to construction costs in growth centers.

(l) From 1960 to 1970, the number of occupied residential units in the San Francisco region increased by 379,000. This increase was in turn made up of 234,000 small households (one and two persons) and 145,000 larger households (three persons and more). The greater rate of increase in smaller than larger households indicates increased demand for housing, with each house, on the average, housing fewer people.

(m) As real income rises, income earners tend to move into better housing. The housing they leave behind "filters down" to persons of lower income.

(n) People in the San Francisco region and elsewhere show a high rate of residential mobility. As of 1970, more than half of the people in the region had lived in their current residence for less than five years. This mobility is a reflection of foreign, interstate and intrastate travel and reflects a demand for housing.

(o) From 1960 to 1970, of a total of 490,782 new housing units constructed, approximately 112,729 units replaced substandard and obsolete housing. This figure represents a replacement of existing housing stock at a rate of approximately one percent per year.

(p) A reasonable forecast of the total increase in the number of households in the San Francisco region for the decade 1970 to 1980 is 274,500. Of these, approximately fifty-four percent will be small and forty-six percent larger households.

(q) A reasonable forecast of the increase in household real income for the period between 1969 and 1979 for San Francisco region families is from a median income of $11,745 in 1969 to a median income of $15,270 in 1979. This shift will result in housing mobility and a "filtration" of vacated housing into the hands of those of lower income, as described in finding no. 14.

(r) A reasonable forecast of the number of housing units needed for replacement of substandard or obsolete housing in the decade 1970 to 1980, at a one percent replacement rate, is 155,280 units.

(s) If the "Petaluma Plan" limiting housing starting at approximately six percent of existing housing stock each year—were to proliferate throughout the San Francisco region, the results would be as explained in the following findings:

(1) For the decade of 1970 to 1980, the "shortfall" in needed housing would be approximately 105,000 units. (For the decade of the 1960's, the shortfall would have been 110,291; and for the decade of the 1950's, 89,376 units.) This shortfall would occur primarily in "growth centers."

(2) Interstate, intrastate and foreign travel would be seriously inhibited, as people trying to move into the region

found housing either economically unavailable or simply nonexistent in reasonable quality.

(3) The cost of regional housing would increase. The specific housing most affected would be "threshold housing," that is, the least expensive housing available without government subsidy, but through institutional financing. Loss of "threshold housing", means in turn, that persons of incomes of $8,000 to $14,000 per year would be deprived of housing to meet their needs.

(4) To service demand in the face of restricted supply old, substandard, or obsolete housing would remain in the regional housing market without decrease in price or rent. The aggregate housing stock for the region would decline in quality at a serious rate.

(5) Persons of incomes lower than $8,000 per year who would have been the beneficiaries of "filtration" of housing left by higher-income earners moving into "threshold housing" would find themselves unable to move into better housing.

(6) With fewer available places, the mobility of residents of the region would be inhibited. People tend not to put their own houses on the market until they have located other housing.

(7) The aggregate effect of a proliferation of the "Petaluma Plan" throughout the San Francisco region would be a decline in regional housing stock quality, a loss of the mobility of current and prospective residents and a deterioration in the quality and choice of housing available to income earners with real incomes of $14,000 per year or less.

15. To the extent that any of the foregoing findings constitutes conclusions of law or mixed findings of law and fact, they are incorporated in the conclusions of law that follow.

## CONCLUSIONS OF LAW

1. The Supreme Court has made it clear that the freedom to travel, which includes the right to enter and live in any State or municipality in the Union, has long been recognized as a basic right under the Constitution, or a "fundamental right." Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); Dunn v. Blumenstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1969).

2. The "Petaluma Plan" is an effort to avoid the problems that accompany contemporary trends in population growth. Through the plan, the defendants propose to address themselves to such problems by limiting the number of people who will henceforth be permitted to move into the city. The express purpose and the intended and actual effects of the "Petaluma Plan" have been to exclude substantial numbers of people who would otherwise have elected to immigrate into the city.

The plaintiffs do not challenge the legitimacy of the defendants' desire to deal with the problems of population growth but contend that the means which they have employed to accomplish their ends fall far short of constitutional validity. In essence, the plaintiffs contend that the question of where a person should live is one within the exclusive realm of that individual's prerogative, not within the decision-making power of any governmental unit. Since Petaluma has assumed the power to make such decisions on the individual's behalf, it is contended that the city has violated the people's right to travel. Considering the facts of the case, we agree.

3. It is not necessary for "standing" purposes that the plaintiffs introduce any evidence relating to any individual who was actually excluded by the plan. As stated in Memorial Hospi-

tal v. Maricopa County, 415 U.S. 250, at p. 257, 94 S.Ct. 1076, at p. 1082, 39 L.Ed. 2d 306 (1974):

"It is true, as appellees argue, that there is no evidence in the record before us that anyone was actually deterred from traveling by the challenged restriction. But neither did the majority in *Shapiro* find any reason 'to dispute the "evidence that few welfare recipients have in fact, been deterred [from moving] by residence requirements." . . . Indeed, none of the litigants had themselves been deterred.' *Dunn,* supra, 405 U.S., at 340, 92 S.Ct. at 1002 (citations omitted). An attempt to distinguish *Shapiro* by urging that a durational residency requirement for voter registration did not deter travel, was found to be a 'fundamental misunderstanding of the law' in *Dunn,* supra, at 339–340, 92 S.Ct. at 1001.

" ' *Shapiro* did not rest upon a finding that denial of welfare actually deterred travel. Nor have other "right to travel" cases in this Court always relied on the presence of actual deterrence. In *Shapiro* we explicitly stated that the compelling-state-interest test would be triggered by "any classification which serves to *penalize* the right to [travel] . . . .' " (Emphasis original, footnote omitted.)

"Thus, *Shapiro* and *Dunn* stand for the proposition that a classification which 'operates to *Penalize* those persons . . . who have exercised their constitutional right of interstate migration', must be justified by a compelling state interest."

See also, Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1971) and Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

4. Inasmuch as there is no meaningful distinction between a law which "penalizes" the exercise of a right and one which denies it altogether, it is clear that the growth limitation under attack may be defended only insofar as it furthers a compelling state interest. Memorial Hospital v. Maricopa County, supra. Moreover, as noted in Dunn v. Blumstein, supra, 405 U.S. at 343, 92 S. Ct. at 1003:

"It is not sufficient for the State to show that [the rules implemented] further a very substantial state interest. In pursuing that important interest the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision'. NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963); United States v. Robel, 389 U.S. 258, 265, 88 S.Ct. 419, 424, 19 L. Ed.2d 508 (1967), and must be 'tailored' to serve their legitimate objectives. Shapiro v. Thompson, supra, 394 U.S. at 631, 89 S.Ct. 1322, at 1329. *And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means'.* Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)." (Emphasis supplied)

We therefore make the following inquiries into the defendants' asserted "compelling state interests" and the alternatives which are available to them which would accomplish the same goals. (See also, Palo Alto Tenants Union v. Morgan, 321 F.Supp. 908, 911 [N.D.Cal. 1970])

5. Essentially, the defendants claim that there are three such compelling interests which support those exclusionary measures adopted. The first of these relates to the obvious necessity for a municipality to provide for adequate sewage treatment facilities and the related contention that the present capacity of Petaluma's facilities is inadequate to serve an uncontrolled population. As found above, however, the present facili-

ties of the defendant city are fully capable of meeting the increased demands of a growing population, and therefore, the purported justification is invalid.

Even assuming, *arguendo*, that the defendants' view of the situation is correct, the question still unanswered is whether there be any reasonable alternative available to meet the problem, the implementation of which alternative would not unduly burden the right to travel. Dunn v. Blumstein, supra. One such alternative which suggests itself is the potential for increasing the capacity of the existing sewage treatment plants, a solution both real and practical.

Resting their argument upon the following syllogism, the defendants contend that the new construction is not a "reasonable" alternative. First, they point out that the erection of additional facilities is an expensive proposition. Second, under state law, the necessary funding would have to be approved by the electorate before it could be secured. The ultimate conclusion is that this court must stand ready to order the citizens of Petaluma to vote in a particular manner before those funds could be assured. The assertion that courts do not order the results of elections is so obvious that comment is not required.

▪ The sole issue in this case is whether or not people currently excluded from Petaluma have the right to immigrate into the area. If so, relief will be granted and their rights will be enforced; after which the matter of dealing with the natural burdens that the exercise of those rights places upon the municipality falls entirely within the discretion of city officials, or the city electorate. Neither Petaluma city officials, nor the local electorate may use their power to disapprove bonds at the polls as a weapon to define or destroy fundamental constitutional rights.

6. The second matter which allegedly "compelled" the defendants to limit population growth relates to the adequacy of the city's water supply. Again, an inquiry into the facts reveals that there is no connection between the availability of water and the exclusionary zoning measures taken. Defendants have purposefully calculated future water needs based upon their own projections which implemented the disputed five hundred unit per year limitation. The city then requested an amount of water which would satisfy the demand of such an artificially limited population.

Where a municipality purposefully limits the quantity of any particular commodity available, then seeks to justify a population limitation based upon an alleged inadequacy of that commodity, it has not stated a compelling interest which supports the limitation. Petaluma has so proceeded in the present case, and accordingly, it has failed to offer a compelling state interest in this regard.

Additionally, "alternative means", including the current ability to request more water supplies from its source, are available to the defendants. For both reasons, therefore, the purported justification set out above must fail.

▪ 7. Defendants point out that virtually all zoning schemes limit the manner in which people move about in one way or another. In doing so, they contend, finally and most frankly, that, by virtue of its zoning power, the city has an inherent right to "control its own rate of growth" and that its citizens' desires to protect its "small town character" are sufficiently compelling reasons to justify the exclusionary ordinances. This last defense assertion states the essence of the matter and aptly defines the issue: may a municipality capable of supporting a natural population expansion limit growth simply because it does not prefer to grow at the rate which would be dictated by prevailing market demand. It is our opinion that it may not.

Zoning ordinances have traditionally been entitled to substantial judicial deference, City of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1922); cf. Nectow v. City of Cam-

bridge, 277 U.S. 183, 48 S.Ct. 447, 72 L. Ed. 842 (1928), but they are not totally beyond review. Palo Alto Tenants Union v. Morgan, supra; Boraas v. Village of Belle Terre, 476 F.2d 806 (2nd Cir. 1973), reversed, —— U.S. ——, 94 S.Ct. 1536, 39 L.Ed. 797 (1974).[1]

The present case is somewhat unique among the federal cases in that it is the only one within our purview which deals with an outright numerical limitation on population. In discussing governmental attempts to control population in another context, the Supreme Court has remarked, in Edwards v. California, supra, 314 U.S. at 173–174, 62 S.Ct. at 167:

> "We have repeatedly and recently affirmed and we now reaffirm, that we do not conceive it our function to pass upon the 'wisdom, need, or appropriateness' of the legislative efforts of the States to solve such difficulties. . . .
>
> "But this does not mean that there are no boundaries to the permissible area of State legislative activity. There are. And none is more certain that the prohibition against attempts on the part of a single State to isolate itself from the difficulties common to all of them by restraining the transportation of persons and property across its borders. It is frequently the case that a State might gain a momentary respite from the pressure of events to the outside world. But in the words of Mr. Justice Cardozo: 'The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the people of the several states must sink or swim

together, and that in the long run prosperity and salvation are in union and not division.' "

Notwithstanding the scarcity of case law on the topic, and in consideration of the general concepts expressed in Edwards v. California, we believe that the reasoning employed in a recent series of cases from the Commonwealth of Pennsylvania best expresses the underlying rationale of those cases which do recognize the right to travel as fundamental. Accordingly, we concur with those decisions and adopt their reasoning as our own view of the law under the Federal Constitution also.

The first of the series was Bilbar Construction v. Board of Adjustment, 393 Pa. 62, 141 A.2d 851 (1958), in which the Supreme Court stressed its continued agreement with the Euclid[2] standard of constitutionality. The Court upheld a minimum lot size requirement of one acre (plus a 150 foot frontage), noting that the provision could be rationally related to the "general welfare," since even aesthetic considerations come within that realm. Several years later, however, the same Court faced a zoning scheme which, when measured against its own "Euclid" standards, left no doubt in the minds of the court that the zoning scheme violated "the fundamental law" plainly, palpably, etc. In National Land and Investment Co. v. Kohn, 419 Pa. 504, 215 A.2d 597 (1966), the Court was presented with another acre plot.

The municipality asserted many compelling state interests which resemble those discussed earlier, such as its desire to deal with sewage problems and to

---

1. Boraas v. Village of Belle Terre has been reversed by the Supreme Court on grounds not relevant to the present case. It was found there that the right to travel was not involved in a zoning regulation which prohibited groups of unmarried persons from living together in the village. In the present case, however, the very reason for being of the "Petaluma Plan" is to keep people out, a patent attempt to affect such excluded persons' right to travel. Accordingly, unlike the *Boraas* decision, the compelling govern-

mental interest standard of review must still be employed in the case at bar, since "fundamental" rights are affected.

2. The Court's language differed slightly from the United States Supreme Court's in Euclid, the Pennsylvania Court electing to provide that the "legislative enactment can be declared void only when it violates the fundamental law clearly, palpably, plainly, and in such a manner as to leave no doubt or hesitation in the minds of the court." 393 Pa. at 70, 141 A.2d at 855.

avoid heavy traffic loads on its road system. The Supreme Court pointed out that under Pennsylvania law municipalities have the power to deal with sewage problems and they should deal with them rather than accept them as they are. With respect to highway traffic the Court made a comment which we consider particularly apropos of the case at bar.

"It can be seen that the restriction to four acre lots, so far as traffic is concerned, is based upon possible future conditions. Zoning is a tool in the hands of governmental bodies which enables them to more effectively meet the demands of evolving and growing communities. It must not and can not be used by those officials as an instrument by which they may shirk their responsibilities. Zoning is a means by which a governmental body can plan for the future—it may not be used as a means to deny the future. The evidence on the record indicates that for the present and the immediate future the road system of Easttown Township is adequate to handle the traffic load. It is also quite convincing that the roads will become increasingly inadequate as time goes by and that improvements will eventually have to be made. Zoning provisions may not be used, however, to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring." 419 Pa. at 527, 215 A.2d at 609–610.

In addition to the discussion relating to its highways and sewers, the defendant in *National Land* also asserted that its efforts to preserve the "character" of the community were permissible zoning objectives. The character could be preserved, it argued, by the creation of a greenbelt and the aesthetics that large-lot zoning offers. Implying that simply "zoning" greenbelts into existence raises due process problems, the Court said,

"[i]f the preservation of open spaces is the township objective, there are means by which this can be accomplished which include authorization for 'cluster zoning' or condemnation of development rights with compensation paid for that which is taken." 419 Pa. at 529, 215 A.2d at 611.

All that remained was the defendant's contention that it was exercising its right to protect the "setting" or the character of the municipality, and that the exercise of that power was valid although it may have the ultimate effect of limiting population growth. As the Court noted, at 419 Pa. 530, 215 A.2d 611

"Appellants denominate this goal as falling within the ambit of promoting the 'general welfare'. Unfortunately, the concept of the general welfare defies meaningful capsule definition and constitutes an exceedingly difficult standard against which to test the validity of legislation. However, it must always be ascertained at the outset whether, in fact, it is the public welfare which is being benefited or whether, disguised as legislation for the public welfare, a zoning ordinance actually serves purely private interests.

"There is no doubt that many of the residents of this area are highly desirous of keeping it the way it is, preferring, quite naturally, to look out upon the land in its natural state rather than on other homes. These desires, however, do not rise to the level of public welfare. This is purely a matter of private desire which zoning regulations may not be employed to effectuate."

At 419 Pa. 532, 215 A.2d 612, the Court summarized the actual rationale which supported the zoning regulation as representing the township's

"position that it does not desire to accommodate those who are pressing for admittance to the township unless such admittance will not create any additional burdens upon governmental functions and services. The question posed is whether the township can stand in the way of the natural forces which send out growing population into hitherto undeveloped areas in

search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, ecomic or otherwise, upon the administration of public services and facilities cannot be held valid . . . .

\* \* \* \* \* \*

"It is clear . . . that the general welfare is not fostered or promoted by a zoning ordinance designed to be exclusive or exclusionary. . . . "

Another minimum lot size requirement[3] was presented in Appeal of Kit-Mar Builders, 439 Pa. 466, 268 A.2d 765 (1970), along with justifications much like the ones raised in *National Land,* supra. The purpose of the regulation, the Court concluded, was the desire *to exclude in order to maintain the community at or near its present size.* The Court then stated, at 439 Pa. 474, 268 A.2d 768–769, as follows

"The implication of our decision in National Land is that communities must deal with the problems of population growth. They may not refuse to confront the future by adopting zoning regulations that effectively restrict population to near present levels. It is not for any given township to say who may or may not live within its confines, while disregarding the interests of the entire area. If Concord Township is successful in unnaturally limiting its population growth through the use of exclusive zoning regulations, the people who would normally live there will inevitably have to live in another community, and the requirement that they do so is not a decision that Concord Township should alone be able to make."

*Kit-Mar* followed an earlier case in which a zoning regulation was held unconstitutional because it "zoned-out" apartment buildings because of their propensity to create traffic problems and other strains on public facilities. In Appeal of Girsh, 437 Pa. 237, 244, 245,

263 A.2d 398, 399, the Court commented as follows

"Appellee here has simply made a decision that it is content with things as they are, and that the expense or change in character that would result from people moving in to find 'a comfortable place to live' are for someone else to worry about.

\* \* \* \* \* \*

"This case deals with the right of people to *live on land,* a very different problem than whether appellee must allow certain industrial uses within its borders."

■ As stated above, we find the reasoning of the Pennsylvania Supreme Court persuasive and sound; and accordingly, we take a similar view. A zoning regulation which has as its purpose the exclusion of additional residents in any degree is not a compelling governmental interest, nor is it one within the public welfare.

8. Since the population limitation policies complained of are not supported by any compelling governmental interest the exclusionary aspects of the "Petaluma Plan" must be, and are hereby declared in violation of the right to travel and, hence, are unconstitutional. Memorial Hospital v. Maricopa County, supra. Such holding is intended to encompass, not only the outright numerical limitations upon the issuance of building permits, but also any and all features of the plan which, directly or indirectly, seek to control population growth by any means other than market demands.

Since we have reached this conclusion, the plaintiffs' contentions regarding the plan's invalidity under the Commerce Clause and remaining Equal Protection arguments need not be considered.

■ 9. The circumstances of the case suggest that in order to assure complete relief to the plaintiffs, the court will retain jurisdiction over the matter until zoning and land use policies of the defendant city are more settled

---

3. In the municipality involved the minimum lot size ranged from two to three acres.

than at the present time.[4] If there be a substantial possibility that the wrong complained of may be repeated in a form other than the one declared to be illegal, such continuing jurisdiction is appropriate. See Field Enterprises v. Cove Industries, 297 F.Supp. 989 (E.D. N.Y.1969). Although plaintiffs contend that the defendants are at this moment embarking upon a "zoning" program which would circumvent the spirit of the present holding, we hesitate to enjoin future activities which may or may not materialize. Cf., *Field Enterprises*, supra; United States v. United States Gypsum Co., 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89 (1950); International Salt Co. v. United States, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20 (1947); United States v. Jefferson County School Board, 372 F.2d 836 (5th Cir. 1966), corrected 380 F.2d 385 (5th Cir. 1967). In the event that the defendants should respond in such a manner, however, the retention of jurisdiction will offer the aggrieved persons immediate access to the court for such action and remedies as may be proper.

10. We believe that it is appropriate, against the background of the present case, for the court to comment upon not only what has been held but also what has *not* been held. The issue here has not been whether or not local government may engage in any number of traditional zoning efforts which have been common throughout our history, such as providing for a certain density of population in a given neighborhood, or standards for the type and quality of construction, etc. The only issue presented here, for the first time, is whether or not a municipality may claim the specific right to keep others away. Therefore, the defendants' assertion that the result of this case will destroy or harmfully restrict the zoning and land-use

planning power of municipalities is neither pertinent nor correct. No "traditional" powers to zone are affected by the holding in the case.

As contended by plaintiffs on pages 7 and 8 of their Trial Brief,

"This case is a study in anti-planning, the refusal of a city to come to grips with the fact that it has joined a metropolitan complex and is no longer the sleepy small town that it once was. In a world in which nothing is as unchanging as change, Petaluma wants to stay the same. The means to that end is to draw up the bridge over the moat and turn people away. This is not the use of police power, but the abdication of that power  . . . .

"In a large sense this case sets up the constitutional protections against a single small city's passing laws to keep people away, to maintain 'small town character' at the expense of depriving people of mobility, their right to travel, and of decent housing or perhaps any housing at all  . . . .

"In a narrower sense, this case [holds]  . . .  that local police power may [not] be used to shift the burden of providing housing to other cities in a metropolitan region which have their own police power and their own problems. This issue  . . . [questions] the jurisdiction of one town to visit its problems on another.

"The prospective resident turned away at Petaluma does not disappear into the hinterland, but presents himself in some other suburb of the same metroplex, perhaps in some town with as many problems or more than Petaluma  . . . .  By this means, Petaluma legislates its problems into problems for Napa, Vallejo or Walnut Creek. May Petaluma pass a law to bind the whole world? See, Bossel-

---

4. Affidavits submitted to the court indicate that since the date of the court's oral order directing the defendants to evaluate future building permits without regard to their numerical limitation policies, the defendants have ceased to issue building permits alto-

gether. While the court hesitates to embark upon contempt proceedings on the basis of oral orders, the refusal to act by the defendants leads us to the conclusion expressed above.

man, 'Can the Town of Ramapo Pass a Law to Bind the Rights of the Whole World?' 1 Fla.State L.Rev. 234 (1973). . . .

## DECLARATORY JUDGMENT AND PERMANENT INJUNCTION

The court has made its findings of fact and conclusions of law in this action. On those findings and conclusions the court grants its declaratory judgment and permanent injunction as follows:

1. The court decrees that the following resolutions and ordinances of the City of Petaluma, insofar as they purport to limit the natural population growth of the area, violate the United States Constitution for the reasons, and limited to those reasons, set forth in the conclusions of law made by the court in this action:

(a) The Petaluma Official Development Policy, June 7, 1971, Resolution No. 5760 N.C.S.;

(b) The Petaluma Environmental Design Plans and Maps, March 27, 1962, Resolution No. 6008 N.C.S.;

(c) The Resolution of Policy Respecting Residential Policy and Population Growth, April 17, 1972, Resolution No. 6028 N.C.S.

(d) The Petaluma Residential Development System, August 21, 1972, Resolution No. 6113 N.C.S.

(e) The Petaluma Housing Element, September 5, 1972, Resolution No. 6126 N.C.S.

(f) All elements of the City of Petaluma general plan, the Petaluma zoning law, the Petaluma subdivision law, or other land use ordinances of the city, that implement the unconstitutional elements contained in subparagraphs (a) through (e) above.

2. The City of Petaluma, Helen Putnam, Robert A. Brunner, John W. Cavanagh, Robert E. Daly, James L. Harberson, Fred V. Mattei, and William A. Perry, and their municipal agents, servants, employees, contractors, attorneys, and each of the successors in interest to all such persons, and all of them, are hereby permanently enjoined from enforcing in any manner the resolutions and ordinances described in paragraph 1(a) through 1(f) above, and the other policies and actions of the city which may have the effect, the intent, directly or indirectly, of placing any numerical limitation, whether definite or approximate, upon the number of persons permitted to enter the City of Petaluma in order to establish residence. Such persons are prohibited from taking any action of any nature, formal or informal, that preserves, duplicates, replaces, reinstates in another form, or otherwise furthers any of the ordinances resolutions, municipal actions, planning, administration of specific land use proposals, or other actions or omissions held by this court to violate the United States Constitution in paragraph one of this declaratory judgment and injunction.

3. The court retains jurisdiction over the subject matter of this action and over all of the parties, including those for whom plaintiffs have standing to sue, and their agents, servants, employees, contractors, members of the Petaluma City Council, attorneys, clerks and others serving municipal functions for the City of Petaluma and subject to its orders and control, and all of their successors in interest, to determine on motion on appropriate notice and subject to the court's discretion any further controversies within the subject matter of this litigation, the findings of fact, conclusions of law, this declaratory judgment or the foregoing injunction in this action.

4. In the event that such further controversies shall arise between the parties, it is the intention of the court to appoint a special master whose function it shall be to hear evidence and to make proposed findings of fact and conclusions of law which may thus arise. Such findings and conclusions shall be subject to immediate review by this court.

(a) The parties may, if they so desire, within a period of thirty days from the date of this order, submit to the court a list of no more than three persons whom they believe to be especially qualified to fulfill the position of special master which is described above.

(b) Such special master shall be compensated at a rate set by the court. The sums due for such services, along with other appropriate legal sums, shall be paid by the party who fails to prevail in such actions.

5. The plaintiffs shall have their costs of suit.